**AYUDA, INC., et al., Plaintiffs,**

v.

**Edwin MEESE, III, Alan Nelson, and INS, Defendants.**

Civ. A. No. 88–0625.

United States District Court,
District of Columbia.

March 30, 1988.
Supplemental Order April 6, 1988.
Supplemental Order II April 7, 1988.
Supplemental Order III April 7, 1988.
Supplemental Order IV May 2, 1988.
Supplemental Order V May 2, 1988.
Supplemental Order VI May 4, 1988.
Supplemental Order VII May 4, 1988.
Supplemental Order VIII June 9, 1988.
Supplemental Order IX June 9, 1988.

Yanti Kapoyos, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., for plaintiffs; Eva M. Plaza, Eleanor Pelta, Carl Valenstein, David Aronofsky, Lynda S. Zengerle, Arent, Fox, Kintner, Plotkin & Kahn, Deborah Sanders, Washington Lawyers' Committee Under Civil Rights Under Law, Washington, D.C., Lucas Guttentag, American Civil Liberties Union, Immigra-

tion Task Force, New York City, Ira J. Kurzban, Kurzban, Kurzban, Weinger & Holtsberg, Miami, Fla., Michael Rubin, Altshuler & Berzon, San Francisco, Cal., Carolyn Waller, Washington Lawyers' Committee for Civil Rights Under Law, Washington, D.C., Gilbert P. Carrasco, Hispanic Nat. Bar Ass'n, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

SPORKIN, District Judge.

This class action lawsuit is now before this court on plaintiffs' complaint seeking declaratory and injunctive relief. Plaintiffs, who are nonimmigrant aliens and organizations whose prime function is to perform immigration counseling, brought this lawsuit to challenge regulations promulgated by the Immigration and Naturalization Service ("INS") implementing the legalization or "amnesty" provisions of the Immigration Reform and Control Act of 1986 ("IRCA"). Plaintiffs contend that the regulations implementing the statutory requirements for nonimmigrants to establish their eligibility for legalization (or amnesty) "violate the plain meaning of the statute, are unreasonable and unlawfully exclude individual plaintiffs and the class they represent from obtaining legal immigration status." Complaint at ¶ 1. Plaintiffs specifically take issue with defendants' interpretation of the statutory phrase "unlawful status was known to the Government" prior to January 1, 1982. *See* 8 U.S.C. § 1255a(a)(2)(B). According to plaintiffs, defendants' regulations unlawfully preclude INS from relying on any other evidence, including Internal Revenue Service records, Social Security Administration records or any other similar federal government records to satisfy the "unlawful status was known to the Government" requirement—even if those records can irrefutably establish that an alien violated his or her nonimmigrant status prior to January 1, 1982.

It is defendants' position that IRCA requires nonimmigrant aliens who claim eligibility for legalization under the "known to the Government" standard to prove affirmatively that the INS itself knew of his or her unlawful status prior to January 1, 1982. In implementing the statute, the defendants have by regulation interpreted the "known to the Government" standard as meaning "known to the INS." Plaintiffs contend that defendants' interpretative regulation is contrary to the plain meaning of the statute and seek declaratory relief as well as an injunction prohibiting that narrow construction of the statutory language.

I held a hearing on March 25, 1988 on plaintiffs' motion for a preliminary injunction at which I heard testimony from three witnesses. The plaintiffs presented testimony from Father Kevin Farrell, a representative of the Associated Catholic Charities and the Spanish Catholic Center of the Archdiocese of Washington, D.C. and Ms. Konjit Getachew, an immigration case worker for the Ethiopian Community Center. These organizations are "qualified designated entities," which is a special status accorded to certain immigration counseling organizations under IRCA. Both Father Farrell and Ms. Getachew are experienced in immigration counseling and are deeply involved in the legalization program. The Government presented testimony from Terrance O'Reilly, the Deputy Commissioner for Legalization of the Immigration and Naturalization Service. Their testimony was credible and I have credited it. I have also heard oral argument.

In light of the obvious need to make an expeditious decision in this matter, and based on the testimony, the oral argument and the written briefs and exhibits, I make the following findings of fact and conclusions of law:

THE FACTS

On November 6, 1986, the President signed into law the Immigration Reform and Control Act of 1986, Pub.L. 99–603. This legislation is the most comprehensive reform of our immigration laws since the enactment in 1952 of the Immigration and Nationality Act ("INA"). The product of intensive Congressional debate, IRCA was crafted carefully to obtain consensus

among competing interests and viewpoints. The Act reflects both a national resolve to control illegal immigration and our Nation's concern and compassion for certain aliens who have been residing illegally in the United States. *See generally* H.R.Rep. No. 682, 99th Cong., 2d Sess., at 46, 49 (1986), U.S.Code Cong. & Admin.News 1986, p. 5649; 52 Fed.Reg. 16205 (May 1, 1987). IRCA contains provisions that address both of these concerns, including employer sanctions for hiring illegal aliens, prohibitions against certain types of employment discrimination, provisions that strengthen the enforcement capabilities of the Attorney General and INS, and several programs for granting legal status to aliens residing illegally in the United States. This lawsuit concerns one aspect of the legalization program.

The central legalization program in the Act provides for the legalization of aliens who entered the United States prior to January 1, 1982, and who have resided continuously in the United States in an unlawful status since that date. Section 201 of IRCA, codified as INA § 245A, 8 U.S.C. § 1255a. Section 201 of the Act provides that in order to be eligible for legalization, an alien must satisfy four requirements: (1) An alien must make timely application. For the vast majority of plaintiffs, that requirement can only be met by filing an application prior to May 4, 1988; (2) An alien must have been in continuous unlawful residence in the United States since 1982; (3) An alien must have been continuously present in the United States since the enactment of the statute on November 6, 1986; and (4) An alien, with certain exceptions, must be admissible as an immigrant. Section 201 of IRCA, 8 U.S.C. § 1255a(a)(1)–(4). Aliens who meet these four requirements shall be granted the status of an "alien unlawfully admitted for temporary residence." 8 U.S.C. § 1255a(a).

Regarding the second requirement, "continuous unlawful residence since 1982," the meaning of which is at the heart of this case, IRCA provides, in its entirety, as follows:

(2) Continuous unlawful residence since 1982

**(A) In general**

· The alien must establish that he entered the United States before January 1, 1982, and that he has resided continuously in the United States in an unlawful status since such date and through the date the application is filed under this subsection.

**(B) Nonimmigrants**

In the case of an alien who entered the United States as a nonimmigrant before January 1, 1982, the alien must establish that the alien's period of authorized stay as a nonimmigrant expired before such date through the passage of time or the alien's *unlawful status was known to the Government* as of such date.

**(C) Exchange visitors**

If the alien was at any time a nonimmigrant exchange alien (as defined in section 1101(a)(15)(J) of this title), the alien must establish that the alien was not subject to the two-year foreign residence requirement of section 1182(e) of this title or has fulfilled that requirement or received a waiver thereof.

8 U.S.C. § 1255a(a)(2) (emphasis added). Aliens who entered the country unlawfully—that is without permission and without inspection at a border—are eligible for legalization if they show continuous residence in the United States since 1982. Such residence, because of the manner they entered the country, is by definition unlawful.

Similarly, aliens who entered the country lawfully as nonimmigrants—that is, entered with the permission of the United States and submitted to inspection at the border—are eligible for legalization if their status became unlawful prior to January 1, 1982. The Act provides that a nonimmigrant can establish the requisite unlawful status by one of two alternative methods. The alien either must establish that the alien's period of authorized stay—that is, his or her visa—expired before 1982 or the alien must establish that the alien violated the terms of his or her visa prior to 1982 and that his or her "unlawful status was

known to the Government." The focus of this case is the meaning of that final term —"unlawful status was known to the Government" prior to January 1, 1982.

On March 19, 1987, INS published a notice of proposed rulemaking on the implementation of the legalization provisions of IRCA in the Federal Register. 52 Fed. Reg. 8752. The proposed rulemaking limited the term "known to the Government" to mean "known to the INS." *See* 52 Fed. Reg. at 16202 (May 1, 1987) (discussing reaction to proposed eligibility requirements for legalization). In response to the proposed rule, INS received 91 comments which addressed the "known to the government" issue. *Id.* According to INS, "[a]ll of the comments clearly stated that the definition was far too restrictive and should be modified to include all Federal agencies." *Id.* Many of the responses also suggested that state and local agencies should be included. *Id.*

On May 1, 1987, INS promulgated final rules implementing the legalization provisions of IRCA. 52 Fed.Reg. 16205 (May 1, 1987) codified at 8 C.F.R. 245a1(d). Despite the public's adverse comments, these regulations provide that in the term "unlawful status was known to the Government," the term "Government" means the Immigration and Naturalization Service. 52 Fed.Reg. at 16206. The regulations provide, in relevant part:

> In the term "alien's unlawful status was known to the Government," the term "government" means the Immigration and Naturalization Service. An alien's unlawful status was "known to the Government" only if:
>
> (1) The Service received factual information constituting a violation of the alien's nonimmigrant status from any

agency, bureau or department, or subdivision thereof, of the Federal government, *and* such information was stored or otherwise recorded in the official Service alien file, whether or not the Service took follow-up action on the information received. In order to meet the standard of "information constituting a violation of the alien's nonimmigrant status," the alien must have made a clear statement or declaration to the other federal agency, bureau or department that he or she was in violation of nonimmigrant status; or

> (2) An affirmative determination was made by the Service prior to January 1, 1982 that the alien was subject to deportation proceedings....; or
>
> (3) A copy of a response by the Service to any other agency which advised that agency that a particular alien had no legal status in the United States or for whom no record could be found.

8 C.F.R. § 245a.1(d) (May 1, 1987).[1]

On September 22, 1987, the district court for the Northern District of Texas, on a motion for a writ of habeas corpus, held that INS' regulations regarding the "known to the Government" requirement are "inconsistent with the Reform Act and are outside the scope of INS' authority." *See generally Farzad v. Chandler,* 670 F.Supp. 690 (N.D.Tex.1987), *motion to alter or amend judgment denied,* Jan. 11, 1988, *motion to dismiss or vacate order denied,* Jan. 12, 1988. Defendants have appealed that ruling to the United States Court of Appeals for the Fifth Circuit. In the meantime, the INS has continued to use these regulations, without any modification to accord with the *Farzad* decision, to process legalization applications pending the resolution of that appeal.[2] Thus despite

---

**1.** While not precisely before me at this time, I would note that the regulations seem to be poorly drawn in respects other than the one challenged herein. For example, the regulations would seem to preclude information contained in the INS' own files that came from sources other than another federal government agency —such as, for example, information from a State or foreign government—from being used to meet the "known to the Government" requirement.

**2.** *See generally* Defendants' Exhibit 1, Dec. 30, 1987 letter from William S. Slattery, Assistant Commissioner of Legalization to Mr. Michael Maggio, Chair AILA–CO Liaison Committee (applications "from applicants who do not meet the standard for 'known to the Government' under 8 C.F.R. 245a.1(d), but who do claim that they are eligible because a government agency, other than INS, had information establishing their unlawful status ... are to be recommended for denial ..."); *see also* Plaintiffs' Exhibit 1, Opin-

the ruling in *Farzad v. Chandler,* it is clear that an individual, although he was in the United States illegally prior to January 1, 1982, does not qualify for legalization without meeting the very limited INS regulations. Individuals who fall into this category are also aware that in order to become legalized in accordance with INS procedures, they will first have to exhaust their administrative remedies and they will then have to defeat the INS in federal court.[3] *Id.* In other words, nonimmigrant aliens realize that obtaining legal status is almost certain to be an expensive, protracted process. Plaintiffs' witnesses have made it clear that INS' stance has deterred many nonimmigrant aliens who would otherwise qualify for legalization from submitting an application.

On November 17, 1987, the INS published an interim final rule that added one additional basis on which an alien's unlawful status could be known to the Government. 52 Fed.Reg. 43843 (November 17, 1987) codified at 8 C.F.R. § 245a.1(d)(4). Pursuant to that amendment, an alien can meet the statutory requirement provided the alien can provide INS with documentation from an approved school wherein the school informed the INS that an alien had violated his nonimmigrant status prior to January 1, 1982. That amendment has been interpreted by INS to mean "that the applicant for legalization can show his or her unlawful status was known to the Government if he or she submits documentation from an appropriate school showing that (1) the school previously reported that the student was in unlawful status, and (2) the previous report was made to the Service prior to January 1, 1982, or, the appropriate school made an 'immediate report' about unlawful status existing prior to January 1, 1982 ... *although the report was received by the Service after January 1, 1982.*" Defendants' Exhibit 4, Declaration of Terrance M. O'Reilly at 2 (emphasis added).

On March 8, 1988 the five named individual plaintiffs and the four organizational plaintiffs brought this lawsuit. The individual plaintiffs are members of a nationwide class consisting of aliens who would otherwise be eligible for legalization but for the INS' interpretation of the "known to the Government" requirement in IRCA. The organizational plaintiffs devote the majority of their efforts to assisting immigrants and have been actively and extensively engaged in the legalization program created by IRCA. The one year amnesty period during which aliens may apply for legalization expires on May 4, 1988.

## JURISDICTION

Before reaching the merits, I must address defendants' contention that this controversy is not yet justiciable. Defendants raise challenges to the standing of both the individual plaintiffs and the organizational plaintiffs. In addition, defendants assert that the doctrine of exhaustion of remedies precludes judicial review at this time. I have reviewed defendants' arguments and have determined that they are without merit.

### A.  *Standing*

■ In assessing the standing issue, I must assume the truth of plaintiffs' uncontested allegations and construe the complaint in plaintiffs' favor. *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 109, 99 S.Ct. 1601, 1613, 60 L.Ed.2d 66 (1979); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In any case, defendants have presented no countervailing factual evidence against plaintiffs' standing allegations.

Article III of the Constitution limits this court's jurisdiction to "cases" and "controversies." *Diamond v. Charles,* 476 U.S. 54, 106 S.Ct. 1697, 1703, 90 L.Ed.2d 48 (1986). In order to satisfy Article III's "case" or "controversy" requirement, a litigant must " 'show that he personally has

---

ion by the Director of the Legalization Appeals Unit, March 18, 1988 (finding applicant ineligible for temporary resident status due to failure to satisfy INS' interpretation of "known to the Government" requirement).

**3.** And, of course, they will have to prevail on appeal if they win at the district court level.

suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.'" *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (footnote and citations omitted). *See also Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

The four organizational plaintiffs in this lawsuit—especially the two which are Qualified Designated Entities ("QDEs") pursuant to IRCA, undoubtedly have standing to bring this lawsuit. These organizational plaintiffs—which include Ayuda, a non-profit legal services agency that provides immigration counseling for low-income Hispanics in the D.C. area, the Ethiopian Community Center, a non-profit entity organized to provide immigration counseling, the Latin American Youth Center ("LAYC"), a not-for-profit corporation organized for the purpose of assisting Latino youth adjust to the norms and institutions of American life, which has been actively involved in counseling applicants for legalization and disseminating information concerning the eligibility requirements of IRCA, and the Mexican American Legal Defense Fund ("MALDEF"), a non-profit legal advocacy organization which has expended considerable resources in counselling applicants about IRCA's eligibility requirements—have standing in their own right.

Each of these organizations has placed a high priority on immigration counseling. Two of these organizations, Ayuda and the Ethiopian Community Center, are Qualified Designated Entities pursuant to IRCA. *See generally* Section 245A(c)(1)–(4) of IRCA; 8 U.S.C. § 1255a(c)(1)–(4). Congress has conferred special status on those organizations which:

... the Attorney General determines are qualified and have substantial experi-

ence, demonstrated competence, and traditional long-term involvement in the preparation and submittal of applications for adjustment of status under section 209 or 245, Public Law 89–732 [8 U.S.C. § 1255 note], or Public Law 95–145.

8 U.S.C. § 1255a(c)(2)(A) and (B).[4] Those organizations selected by the Attorney General to be QDEs add valuable assistance to the legalization process through counseling applicants, disseminating information about the program and by screening and processing applications. *See generally* 8 U.S.C. § 1255a(c)(1)–(4). In short, the QDEs act as intermediaries between the alien and the INS. *See*, Exhibit B of Plaintiffs' Reply Brief, Articles I and IV of the QDE Standard Form Cooperative Agreement. In order to perform their statutory mission—and to function effectively as qualified designated entities—these organizations and others similarly situated must, at the very least, have a clear and correct interpretation of the legalization program's eligibility requirements—including the requirement that a nonimmigrant's "unlawful status was known to the Government" as of January 1, 1982.

At the present time, however, the ability of each of these four organizations to provide accurate information concerning the eligibility requirements for legalization under IRCA, which is both a function the statute assigns to QDEs and one of the organizations' primary goals, has been impaired by the legal confusion created by INS' narrow construction of the statute. That confusion arose from INS' replacement of the word "INS" for the word "Government" in the statutory term "unlawful status was known to the Government." The uncertainty was exacerbated by the *Farzad v. Chandler* court's subsequent invalidation of INS' interpretation and INS' intransigent reaction to that outcome. The testimony of both Father Farrell and Ms. Getachew made it obvious that at the present time, the QDEs and other

---

4. *See also* 52 Fed.Reg. 16208, 16209 (May 1, 1987), 8 C.F.R. § 245a.1(1) ("'designate entity' means any state, local, church, community, farm labor organization, voluntary organiza-

tion, association of agricultural employers or individual determined by the Service to be qualified to assist aliens in the preparation of applications for Legalization status).

organizations trying to provide immigration counseling are whipsawed between the federal court's invalidation of INS' construction of the statute and the agency's steadfast refusal to acquiesce in that ruling.

Because of the confusion about the "known to the Government" standard, plaintiff-organizations are handicapped in their ability to perform their core function —immigration counseling. That inability arises both from the fact that the message they seek to disseminate to nonimmigrant aliens is hopelessly confused and contradictory, and because the "word on the street" deters many potential nonimmigrant applicants from even seeking their advice. The organizational plaintiffs' predicament is summed up well by Ayuda's Executive Director, who states:

> Our ability to provide accurate information on eligibility requirements is impaired by the INS regulation, 8 C.F.R. § 245a.1(d) (1987), on the proper interpretation of the phrase "known to the Government" as contained in the statute, 8 U.S.C. § 1255a[a](2)(B). Although we believe that the regulation clearly goes beyond the meaning and authority of the statute, we cannot tell prospective applicants who seek legal guidance from us that they are eligible for legalization because of the continuing existence of the regulation. On the other hand, we are reluctant to inform such prospective applicants that they are ineligible on the basis of a regulation that we consider facially invalid. Moreover, if such advice were given and such persons did not apply as a result, an effort to establish Ayuda's liability for causing the loss of this valuable legal entitlement might be made by those who would have otherwise applied when the regulation is invalidated.

Affidavit of Yvonne M. Vega at ¶ 4. Hence, the organizational plaintiffs' substantive goals have been frustrated—because of the INS' regulations they have been largely unsuccessful in helping otherwise eligible nonimmigrants obtain legal status under IRCA's legalization program.

Furthermore, as the plaintiffs' affidavits demonstrate, the contradictory signals sent out by INS, the *Farzad* court and the plain language of the statute has made these organizations' immigration counseling tasks much more complex, burdensome and time consuming than they should be. The organizations' limited resources are being needlessly squandered because of the INS' regulations. That is so for two principal reasons.

First of all, because of the "word on the street" that non-immigrant aliens with "known to the Government" problems will be denied legalization by INS, many of these individuals have decided for themselves that they are not eligible for legalization under defendants' current regulations. These individuals "self-disqualify" and never contact an attorney or counselor. Testimony of Father Farrell and Ms. Getachew; *see also* Affidavit of Charles Gordon at ¶ 5; Affidavit of Nicole Kim at ¶ 9 ("... many aliens who qualify for legalization under the known to the Government standard are unaware of their eligibility ..."); Affidavit of Darlene Kalke at ¶ 10. The plaintiff-organizations have been forced to expend extensive additional resources on outreach and publicity in their effort to overcome the deterrent effect of INS' regulations and to encourage these nonimmigrant aliens to seek immigration counseling and to apply for legalization prior to the May 4, 1988 deadline. Despite these efforts, significant numbers of otherwise eligible potential applicants for legalization have been deterred from filing by INS' policy.

The second drain on the resources of organizational plaintiffs is that they spend a substantial amount of time and resources handling the complexities of "known to the Government" cases. Organizational plaintiffs have been forced to undertake the daunting task of explaining to nonimmigrant aliens the meaning of INS' regulations—and how those regulations jibe with the statutory language in IRCA. They have to provide individuals with "known to the Government" problems advice about how to proceed—namely whether or not to invest the substantial time and money nec-

essary to file an application (and protect their statutory right to legalization) despite the strong likelihood that INS will deny them legalization. Furthermore, the organizational plaintiffs are strapped with the burden of shepherding those nonimmigrant aliens with "known to the Government" problems who do, in fact, apply for legalization through the administrative maze simply to get into federal court to challenge INS' interpretation.

These costs are considerable, and divert scarce organizational resources from other aliens who need assistance. Because of this drain on their resources, the organizational plaintiffs' ability to achieve their goals has been severely hampered. Moreover, Ayuda's and the Ethiopian Community Center's ability to carry out their functions as QDEs—particularly their obligations pursuant to the Cooperative agreements they entered into with the INS to provide legalization services and public information, (*see infra*), is being substantially impaired by the INS interpretation of "known to the Government." *See* Affidavit of Yvonne M. Vega at ¶ 7.

Another product of the confused state of the "known to the Government" standard is that the QDEs have been placed in an intolerable and conflicting position. They are permitted under IRCA to obtain funds for processing applications. These fees are not inconsiderable, amounting in some cases to almost $200. As counselors and advisors, their motives could be questioned if they counseled individuals falling in this nonimmigrant alien class to file their application for legalization contrary to the position taken by the INS in the hope of obtaining a reversal of that position through the administrative process. If the INS' position is sustained, the applicants will have not only lost their right to remain in the United States, but also would have suffered considerable damages because of the

funds they would have expended in the application process. These monies are non-refundable. It could be expected or anticipated that many of those unsuccessful applicants could be expected to seek recourse against the QDEs for their erroneous counseling. In those instances where the QDEs have advised against going forward, they of course leave themselves vulnerable to complaints by individuals who have failed to make a timely filing—if in fact the INS' position is eventually reversed. The QDEs have a powerful interest in resolving this conflict. They need certainty in this field, and they need it now.[5]

This conflict is exacerbated by Article IV, ¶ 3.2 of the Cooperative Agreement between the QDEs and INS. That paragraph requires the staff of QDEs to comply with all INS regulations relating to the legalization program. The defendants take the position that this provision means that a QDE staffer must enforce even a regulation that is facially contrary to law—as is the regulation challenged in this lawsuit. I believe that such a position compounds the QDEs' problem and provides an even more compelling reason to give the organizations the right to have the issue resolved. Otherwise, they will be required to carry out a regulation that is contrary to law. I am deeply troubled by the INS' position that they have the contractual right to compel an organization to carry out a regulation that on its face violates the law—and that nevertheless, the organizations lack standing to challenge that interpretative regulation.[6]

These facts portray a classic case for organizational standing. Nevertheless, the defendants contend that "[t]he organizational plaintiffs are not within the scope of the statute and have not suffered injury for standing purposes." Defendants' Brief at 22.

---

5. The QDEs' right to a prompt resolution of their conflict is particularly powerful because these organizations are acting as Good Samaritans and are responding to both the pleas of their government and their community.

6. I note also that the INS' conception of its relationship with the QDEs is directly contrary to the arms-length, independent relationship Congress intended so as to preserve the immigration community's trust in the QDEs—and hence their ability to perform outreach and immigration counseling.

In order to establish standing to sue, an organization must satisfy both constitutional and prudential requirements. The D.C. Circuit has summarized the standard as follows:

> To establish standing to challenge an agency's handling of its affairs a plaintiff must plausibly (1) allege injury in fact derived from the agency's action or inaction and remediable by the court's order, and (2) assert that the injury is arguably within the zone of interests protected or regulated by the law on which the the complaint is founded.

*Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931, 936 (D.C.Cir.1986). *See also Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982); *Capital Legal Foundation v. Commodity Credit Corp.,* 711 F.2d 253, 259 (D.C.Cir. 1983).

Numerous courts have held that allegations strikingly similar to those made by the four organizational plaintiffs in this case were sufficient to establish injury in fact. In the leading Supreme Court case about organizational standing, *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), the Court held that the plaintiff organization—a housing counseling organization that promoted integrated housing called Housing Opportunities Made Equal ("HOME")—had standing to challenge the racially discriminatory steering practices of the defendant real estate agency. In reaching that conclusion, the Court stated:

> If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more that simply a setback to the organization's abstract social interests.

*Id.* 455 U.S. at 379, 102 S.Ct. at 1124. Similarly, in *Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931 (D.C.Cir. 1986) the D.C. Circuit held that an organization which relied on the government's dissemination of certain information to accomplish its own counseling, referral services and information dissemination had standing to challenge government regulations which reduced the amount of information disseminated by the government. In finding that the plaintiff satisfied the injury in fact requirement, the Court emphasized that:

> Unlike the 'mere interest in a problem' or ideological injury in *Sierra Club* [*v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed. 2d 636], the AASC organizations have alleged inhibition of their daily operation, an injury both concrete and specific to the work in which they are engaged.

*Id.* 789 F.2d at 938. In both *Havens Realty* and *Action Alliance,* the plaintiff alleged both a drain on its organizational resources and that it was hindered by the challenged activity in meeting its organizational goals.[7]

As was the case in both *Havens Realty* and *Action Alliance,* the INS' narrow con-

---

7. Several courts that have applied the *Havens Realty/Action Alliance* standard have stressed the "two-fold" nature of the inquiry into organizational injury in fact. *See e.g. Bittner v. Secretary of Defense,* 625 F.Supp. 1022, 1025 (D.D.C.1985) ("when an organization alleges that it has been *hindered* by a defendant in its efforts to assist others to obtain constitutional or statutory rights *and* that it has had to *devote significant resources* to counteract a defendant's action, it has alleged a sufficient injury to itself to establish standing") (emphasis added); *see also Cleburne Living Center v. City of Cleburne,* 726 F.2d 191, 203 (5th Cir.1984) *aff'd* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Davis v. Mansards,* 597 F.Supp. 334, 343 (N.D. Ind.1984); *Minority Employees v. Tennessee,* 573 F.Supp. 1346 (M.D.Tenn.1983).

The accepted view in this circuit, however, is that an organization need not prove a drain on its resources in order to "come within the *Havens* formula." *See Action Alliance, supra,* 789 F.2d at 937–38; *Haitian Refugee Center v. Gracey,* 809 F.2d 794, 799, n. 2 (D.C.Cir.1987) (Bork, J.). In any case, all four of the organizational plaintiffs meet the more stringent test for organizational injury in fact.

struction of the statute has markedly impaired the plaintiff-organizations' ability to perform its core functions and to achieve its organizational goals.[8] This case is on all fours with the facts in *Action Alliance.* Like the plaintiff organizations in *Action Alliance,* the government action which these plaintiff organizations challenge has undercut their ability to disseminate accurate information to the individuals they seek to serve—a core organizational function.

Finally, I note that as the Supreme Court made clear in *Havens,* it is irrelevant that the organizational interests injured by INS' actions are in substantial part non-economic in nature:

> That the alleged injury results from the organization's non-economic interests in encouraging open housing does not effect the nature of the injury suffered, *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 263 [97 S.Ct. 555, 562, 50 L.Ed.2d 450] (1977), and accordingly does not deprive the organization of standing.

*Havens Realty, supra,* 455 U.S. at 379, n. 20, 102 S.Ct. at 1124, n. 20. Both the economic and the non-economic harms these organizations have absorbed because of INS' policy count toward satisfying the injury in fact requirement. There can be no question that these organizational plaintiffs have shown sufficient injury for Article III standing. *See generally United States v. Students Challenging Regulatory Agency Procedures ("SCRAP"),* 412 U.S. 669, 689, 93 S.Ct. 2405, 2416–17, 37 L.Ed.2d 254 (1973).

There also can be no question that the organizational plaintiffs' interests are arguably within the zone of interests protected or regulated by the statutory provision in question. The D.C. Circuit has emphasized that "[t]he zone of interests adequate to sustain judicial review is particularly broad in suits to compel federal agency compliance with law, since Congress itself pared back traditional prudential limita-tions by the Administrative Procedure Act ..." *FAIC Securities, Inc. v. United States,* 768 F.2d 352, 357 (D.C.Cir.1985) (citations omitted). *See also Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Similarly, the Supreme Court recently held that the zone of interests test "is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would be plaintiff." *Clarke v. Securities Industry Association,* 479 U.S. 388, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987). According to the Court, "the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.*

In this case, Congress clearly placed these organizational plaintiffs squarely within the zone of interests created by IRCA. Through IRCA, Congress has provided a special status for community organizations such as plaintiff organizations and has accorded many of them—including plaintiffs Ayuda and the Ethiopian Community Center—the special status of Qualified Designated Entities. *See* 8 U.S.C. § 1255a(c)(2). In doing so, Congress recognized the special relationship between these community organizations and the individual nonimmigrant aliens:

> The bill provides that applications for legalization may be filed with the Attorney General or voluntary State, local, and community organizations and individuals designated by the Attorney General as qualified ...
>
> The Committee has learned that legalization programs in other countries have usually produced a low rate of participation among the eligible candidates. At least part of the reason is the distrust of authority and lack of understanding among the undocumented population. The Committee hopes that by working

---

**8.** The organizational plaintiffs' core functions are spelled out in detail at ¶¶ 7–10 of the Complaint for Ayuda, Inc.; ¶¶ 11–13 of the Complaint for The Ethiopian Community Center, Inc.; ¶¶ 14–17 of the Complaint for the Latin American Youth Center and ¶¶ 18–21 of the Complaint for the Mexican American Legal Defense and Educational Fund.

through the voluntary agencies, the Attorney General might be able to encourage participation among undocumented aliens who fear coming forward. To assist in this endeavour, the bill authorizes the Attorney General to fund outreach service ...

H.R.Rep. 99–682, Part I, at 72–73, 99th Cong., 2d Sess., U.S.Code Cong. & Admin. News 1986, pp. 5676, 5677. As discussed above, the QDEs are required by the terms of their cooperative agreements with INS to perform the function of intermediaries between INS and the Act's beneficiaries. They are charged by IRCA with responsibility for outreach to the alien community, counseling of aliens and processing their applications for legalization. In short, IRCA formally recognizes the QDEs as both the alien's representative and his or her "best friend." The beneficiary's interests are their interests. They are truly "two sides of the same coin." *FAIC Securities, Inc. v. United States,* 768 F.2d 352, 359 (D.C.Cir.1985) (Scalia, J.). The special institutional role provided QDEs by the Act not only carries certain responsibilities, but also enables the QDEs to more effectively aid those aliens eligible to apply for legalization. In so doing, it permits them to better achieve their organizational goals. It is INS' impairment of their ability to perform adequately this special role which has led these QDEs to bring this lawsuit. Because "the challenging party need only show that it is an intended beneficiary of the statute, not necessarily the primary one," *Constructores Civiles de Centroamerica S.A. v. Hannah,* 459 F.2d 1183, 1189 (D.C.Cir.1972), these organizational plaintiffs meet the zone of interests test.[9]

B. *Exhaustion of Administrative Remedies*

█ Defendants argue that plaintiffs may not bring this case until after they exhaust their administrative remedies. That argument is without merit. Defendants' exhaustion argument is simply inapposite when applied to the organizational plaintiffs. No administrative remedy exists for organizational plaintiffs to resolve the conflict between the *Farzad v. Chandler* ruling and the plain meaning of the statute on the one hand and the INS' narrow interpretation of the "known to the Government" requirement on the other. There is simply no administrative process to which to appeal. For the harm suffered by organizational plaintiffs, therefore, no exhaustion is necessary. Their remedy can only be found in federal court.

PLAINTIFFS SATISFY THE STANDARD FOR INJUNCTIVE RELIEF

In the District of Columbia Circuit, the appropriate four-step test for the issuance of a preliminary injunction is that the movant show that: 1) the party seeking relief is likely to prevail on the merits; 2) that it will suffer irreparable injury if the preliminary relief is not granted; 3) that harm to others will not result if the relief is granted; and 4) that granting the injunction is in the public interest. *Washington Metropolitan Transit Commission v. Holiday Tours,* 559 F.2d 841 (D.C.Cir.1977); *Virginia Petroleum Jobbers, Association v. FPC,* 259 F.2d 921 (D.C.Cir.1958).

A. *Plaintiffs Will Prevail on the Merits*

█ This case poses a circumscribed legal question. The sole legal issue before me is the legality of INS' interpretation of the term: "unlawful status was known to the government as of [January 1, 1982]." The Supreme Court has set forth the appropriate standard and methodology for deciding whether the INS' interpretation of the contested phrase conflicts with IRCA in clear and certain terms:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of

---

9. Because I have determined that the organizational plaintiffs have standing to bring this lawsuit, and because of the need for a prompt resolution of this matter, I do not reach either the issue of individual plaintiffs' standing or the question of whether the plaintiff organizations have third-party standing to assert the interests of the individual nonimmigrant alien plaintiffs.

Congress is clear, that is the end of the matter; for the court as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (footnotes omitted).

### 1. Congress' Intent is Made Clear by the Plain Meaning of the Statutory Language

The first step in the analysis mandated by *Chevron* is to determine whether the "the statute unambiguously expresses Congressional intent on the precise question at issue." *Coalition to Preserve the Integrity of American Trademarks v. United States,* 790 F.2d 903 (D.C.Cir.) *cert. granted sub nom. K Mart Corporation v. Cartier,* 479 U.S. 1005, 107 S.Ct. 642, 93 L.Ed.2d 699 (1986). Obviously the first place to look for legislative intent is in the words of the statute. There is a powerful presumption that Congress means what it says—and that Congressional intent is expressed by the plain meaning of the language used. *INS v. Hector,* 479 U.S. 85, 107 S.Ct. 379, 381, 93 L.Ed.2d 326 (1986), *on remand Hector v. INS,* 810 F.2d 65 (3rd Cir.1987).

I believe that INA Section 245(a)(2)(B) is crystal clear: A nonimmigrant alien appli-cant may qualify for legalization if he or she can prove that his or her "unlawful status was known to the *Government*" as of January 1, 1982. Both the ordinary meaning of the word "Government"—which obviously is not usually taken to mean "INS"—and Congress' use of the term elsewhere in IRCA undercuts defendants' limited construction of "Government" to mean "INS." [10]

Throughout the text of IRCA, Congress exhibits its ability to differentiate between the "INS" and the "Government." As the *Farzad v. Chandler* court points out, "Except in [Section 245A(a)(2)(B) ], Congress refers specifically to the Attorney General and INS throughout the Reform Act; here, by contrast, it consciously chose to use the term "the Government." 690 F.Supp. at 693. When Congress intended to specify a particular agency of the federal government, it used the name of that agency. For instance, according to plaintiffs, Congress referred to the "Attorney General" at least 35 times in IRCA when it sought to single him out.[11] Similarly, when Congress sought to refer to the entire federal government in IRCA it used the term "Government."[12] Moreover, when Congress sought to refer to more than one agency but less than the entire "Government," it modified the term "Government."[13]

Hence, when crafting IRCA, Congress chose its words with care. Contrary to defendants' suggestion that "the wording of the ['known to the Government'] provision suggests that it was not well-crafted," a close examination of IRCA reveals careful attention to the difference between the "Government" and the "INS." IRCA is plainly not a statute where Congress used

---

10. *See Farzad v. Chandler,* 670 F.Supp. 690, 693 (N.D.Tex.1987).

11. *See, e.g.* INA §§ 274A(b)(1)(A), 8 U.S.C. § 1324a(b)(1)(A); 274A(b)(1)(D)(i), (ii), 8 U.S.C. § 1324a(b)(1)(D)(i), (ii); 274A(e), 8 U.S.C. § 1324a(e); 245A(a), 8 U.S.C. § 1255a(a).

12. *See e.g.* INA § 274A(d)(2)(C), 8 U.S.C. § 1324a(d)(2)(C) (amending INA to limit access by "Government" agencies to information utilized by employers to verify work authoriza-tion); INA § 245A(h)(1)(A)(i), 8 U.S.C. § 1255a(h)(1)(A)(i) (Attorney General must consult with "appropriate heads of the *various departments and agencies of Government*").

13. *See e.g.* INA Section 290(a), 8 U.S.C. § 1360(a) ("security and enforcement agencies of the Government"); INA § 214(c), 8 U.S.C. § 1184(c) ("appropriate agencies of Government" are the Departments of Labor and Agriculture).

the term "Government" to refer to the agency charged with administering the Act.[14] *See Farzad v. Chandler,* 690 F.Supp. at 693. The language used in the Act provides no basis for the defendants' implicit claim that Congress used the terms INS and "Government" interchangeably. Rather, Congress consistently distinguished between the two throughout IRCA. There is no basis to believe that Congress departed from that uniform practice when it used the term "known to the Government" in § 245A(a)(2)(B). *See e.g. Atlantic Cleaners and Dyers, Inc. v. United States* 286 U.S. 427, 433, 52 S.Ct. 607, 608–09, 76 L.Ed. 1204 (1932) (absent evidence to the contrary, it must be presumed that Congress intends a word or term to have the same meaning throughout a statute); *Yamaguchi v. State Farm Mutual Automobile Insurance Co.,* 706 F.2d 940, 947 (9th Cir.1983) (accord).

Furthermore, exceptionally telling evidence that Congress meant "Government" when it said "Government" is found in the section of IRCA which immediately follows the legalization provisions at issue here. An examination of the language used in that section, which sets forth the eligibility criteria for Cuban–Haitian Adjustment, shows unmistakably that Congress knew how to require an INS determination of immigration status when it so desired.

**14.** Defendants' argument also falls short of explaining the rationale for shaping the regulations to preclude an applicant from using knowledge possessed by the Attorney General as a means to satisfy the statutory requirement.

**15.** At the hearing, defendants brought to this court's attention that the phrase "unlawful status was known to the Government" was also used in Section 501 of the Act. That section provides for reimbursement of a State by the federal government for the costs of imprisoning an illegal alien convicted of a felony by that State. The Act provides, in relevant part, that:

(b) ILLEGAL ALIENS CONVICTED OF A FELONY—An illegal alien referred to in subsection (a) is any alien who is any alien convicted of a felony who is in the United States unlawfully and—
(1) whose most recent entry into the United States was without inspection, or
(2) whose most recent admission to the United States was as a nonimmigrant and—
(A) whose period of authorized stay as a nonimmigrant expired, or

Congress stated that the benefits of Cuban–Haitian Adjustment would be permitted any alien:

(1) who has received an immigration designation as a Cuban/Haitian Entrant ... as of the date of the enactment of this Act, or

(2) who is a national of Cuba or Haiti, who arrived in the United States before January 1, 1982 *with respect to whom any record was established by the Immigration and Naturalization Service before January 1, 1982 ...*

IRCA § 202(b)(1), (2), Pub.L. 99–603 (emphasis added). When Congress sought to specify that *INS* must make a determination of an alien's unlawful status, it did so in straightforward terms. Had it wanted to make such a specification in the legalization provision at issue, it certainly could have done so. It consciously chose not to. That intentional choice must be given effect by the regulations. *See Chevron, supra,* 467 U.S. at 843, n. 9, 104 S.Ct. at 2781, n. 9; *INS v. Cardoza–Fonseca,* —— U.S. ——, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987).[15]

2. The INS Regulation Violates Congress' Intent as Revealed in the Legislative History of IRCA

Supreme Court precedent dictates that when the plain language of the statute

(B) whose *unlawful status was known to the Government.*
Section 501 of IRCA (emphasis added). This use of the term "unlawful status was known to the Government" reinforces my conclusion that Congress meant what it said in Section 245A. In Section 501, Congress could not conceivably have intended the INS to substitute the word "INS" for the word "Government." At the very least, in drafting Section 501, Congress must have meant the term "known to the Government" to be interpreted with sufficient breadth to encompass knowledge of unlawful status possessed by both the Federal Bureau of Investigation ("FBI") and the Drug Enforcement Agency ("DEA"). To exclude information possessed by the agencies which come into the closest contact with alien felons would render the provision meaningless. To do so would be to disregard the largest, most readily available and most reliable source of such information in criminal cases.

"appears to settle the question," a court may "look to the legislative history to determine only whether there is 'clearly expressed legislative intention' contrary to that language, which would require [a court] to question the strong presumption that Congress expresses its intent through the plain meaning of the language it chooses." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 1213, n. 12, 94 L.Ed.2d 434 (citations omitted). In this case, rather than casting doubt on the conclusion that inexorably flows from the statutory language, the legislative history compellingly supports the plain meaning of the statute.

In light of the plain meaning of the language used, the burden is squarely on defendants to come forward with evidence of contrary legislative intention.[16] Defendants have failed to meet that burden. Their briefs provide no tenable explanation for the substitution of the word "INS" for the word "Government," and nothing emerged at the hearing to support such a construction. The principal argument put forward by defendants for their narrow construction of the term is that the requirement works to classify nonimmigrant alien applicants for legalization into two categories—those that Congress sought to legalize and those that it wanted to exclude from amnesty. According to defendants' understanding of the legislative history:

> Nonimmigrants—like plaintiffs—who merely commit technical violations of their status—like working as students or changing employers as domestic help—are not likely to be the assimilated members of the subclass that Congress wanted to legalize.

Defendants' Brief at 29. This contention finds little support in the legislative history. The notion implicit in this argument—that Congress only wanted to permit those aliens who had committed flagrant violations of their legal status to be legalized—is without support.[17] Had Congress possessed such an untoward intent, it easily could have expressed it with substantially greater clarity and in far more direct terms. In short, there is no support in IRCA for drawing artificial, technical distinctions between various categories of illegal aliens.

To the contrary, both the words and the legislative history of IRCA express Congress' intent that the eligibility standards for legalization be flexible so as to effectuate the Act's broad remedial purpose. Congress ordered INS to take into consideration the special circumstances of illegal aliens and explicitly prohibited the use of "unnecessarily rigid demands for proof of eligibility for legalization." 132 *Cong.Rec.* H. 9709 (Oct. 9, 1986) (Statement of Rep. Rodino). The core guiding principle of Congress' consideration of an amnesty program was that it would be necessary—with certain very limited exceptions (*i.e.* for felons)—to legalize *all* aliens in unlawful status as of a certain date.[18] IRCA reflects the consensus that developed around this principle. INS' regulation, however, by rendering it nearly impossible for a nonimmigrant alien to establish such unlawful status, effectively denies legalization to an

---

**16.** It is not surprising that neither party can unearth any legislative materials which focus specifically and directly on the term "unlawful status was known to the Government" as of January 1, 1982. That term is self-explanatory. Both parties, however, draw from the more general legislative materials to make their arguments about what legislative intent can be divined beyond that which is readily evident from the statutory language.

**17.** Defendants also argue that:
Violations of status which are more than technical violations would normally be brought to the attention of the INS, and aliens in such situations would be in jeopardy of remaining in the United States. Such aliens would have evidenced the degree of intent to remain in the United States which Congress has made clear was intended to be benefited by the statute.
Defendants' Brief at 36–37. The idea that the seriousness of a nonimmigrant alien's violation of lawful status is somehow correlated with that alien's degree of intent to remain in the United States is without foundation in law or reason. I therefore reject defendants' attempt to justify the use of the word "INS" rather than "Government" on this basis.

**18.** *See generally U.S. Immigration Policy and the National Interest,* 97th Cong., 1st Sess. 72–80 (Report presented to the Joint House and Senate Committees on Judiciary, Aug. 1981) ("Commission Report").

entire class of aliens. Congress never intended for the "unlawful status was known to the Government" requirement to have such an effect.

Rather, the plain language of the Act, its overall structure and the legislative history suggest that the "known to the Government" requirement was designed as an evidentiary safeguard against document fraud. Congress was certainly concerned about the possibility of document fraud in the legalization program. 132 Cong.Rec. S16888, 16892 (Oct. 17, 1986); 132 Cong. Rec. H10586 (Oct. 15, 1986). As a result, it created stiff penalties for immigration-related fraud as part of IRCA and placed the burden of proof of eligibility for legalization on the applicant. The "known to the Government requirement" is a central part of this anti-fraud effort. Properly understood, the term establishes an easily administered bright line rule which both satisfactorily protects against fraud yet provides the applicant with an opportunity to document his unlawful status prior to January 1, 1982. Placed in this context, it is readily apparent that the requirement is satisfied if *any* Government agency currently possesses a document that shows the applicant violated his or her legal status earlier than January 1, 1982. Because all federal government agencies are reliable sources of such documentary evidence, no legitimate purpose is served by INS' excessively narrow construction.

Furthermore, the anti-fraud purpose of the requirement also undercuts defendants' prime rationale for substituting "INS" for "Government"—that is their claim that only an INS official can "know" that an individual has violated his lawful status. *See* Defendants' Brief at 36.[19] Obviously, knowledge—in the form of possession of a document—can evidence that the Government "knew" of an individual's unlawful status as of a certain date. Therefore, contrary to defendants' contention, it is not necessary to replace the word "Government" with the word "INS" in order to give meaning to the word "know."

### 3. Application of the INS Regulations

In order for an applicant to meet the INS' "known to the Government" requirement, the agency's regulations require a showing that: 1) the INS made a determination that the applicant was deportable; 2) that the alien made a clear declaration to a federal agency of his or her unlawful status, that the agency in turn informed INS and that INS placed that information in an "official file"; or 3) that INS advised another federal agency that the alien had no legal status or record. *See* 8 C.F.R. § 245a.1(d) (May 1, 1987). I agree with Judge Fish's view in *Farzad v. Chandler* that these regulations are narrow and operate in practice to prevent some valid claims. It would seem that few of those individuals who met the first requirement—agency adjudicated deportability—more than six years ago can presently be in a position to benefit from the legalization program. The second requirement essentially requires a nonimmigrant alien to make voluntary confession of "unlawful status" to a federal agency—an unlikely event. Moreover, as Judge Fish explained in *Farzad v. Chandler,* even if an applicant made such a declaration against interest, rarely will such information get into an INS official file:

> The further requirement that the "factual information" received from another government agency must have been in an official INS file means, as a practical matter, that this provision could rarely, if ever, be invoked. INS concedes that the vast majority of nonimmigrants do not have an official file with the INS unless and until they are somehow determined to have been in violation of their status.

Even if the person were under suspicion by INS prior to January 1, 1982, it has been documented in this case that INS does not record how or when it initially learned of such a violation of status. Without such recordkeeping, INS would make it impossible, through its own practices, for an applicant to

---

**19.** Defendants contend that [t]he mere fact that an alien comes into contact with a government entity does not establish that anyone in the government *knew* that the alien was in the United States "unlawfully." Defendants' Brief at 36 (emphasis in the original).

meet the burden required by the interpretation of the Act.

670 F.Supp. at 694. The third requirement adds little to the first two. I believe that the position that plaintiff Farzad took accurately sums up the effect of INS' regulations:

> ... under the interpretation of "known to the Government" urged by INS, no alien would be eligible; he would either have been deported or would not be able to document his presence due to gaps in INS' recordkeeping.

*Id.* Neither in the *Farzad v. Chandler* litigation nor in this court have defendants adequately dealt with this concern.

The application of the "known to the Government" regulation also at times has been somewhat inconsistent. During the questioning of Terrance O'Reilly, INS' Deputy Commissioner for Legalization, it was disclosed that the INS has, in fact, deviated from the statute and its position that a nonimmigrant alien can only comply with IRCA if he or she can demonstrate that the information concerning his or her unlawful status in the United States was known to INS prior to January 1, 1982. Mr. O'Reilly conceded that in at least one area, involving American universities, that INS will accept such information from such institutions showing the unlawful status of the nonimmigrant submitted by the institutions to the INS after January 1, 1982 so long as the information pertained to the period before January 1, 1982. This testimony was later confirmed by affidavit, wherein Mr. O'Reilly stated:

> the applicant for legalization can show that his or her unlawful status was known to the Government if he or she submits documentation from an appropriate school showing that (1) the school previously reported that the student was in unlawful status, and (2) the previous report was made to the Service prior to January 1, 1982, or, the appropriate school made an "immediate report" about unlawful status existing prior to January 1, 1982m as required by the regulation existing at the time, 8 C.F.R. § 214.3(g) (1981), *although the report*

> *was received by the Service after January 1, 1982.*

Affidavit of Terrance O'Reilly, March 25, 1988, at 2 (Defendants' Exhibit 4) (emphasis added). The underlying rationales for this exception were basic principles of fairness and the agency's confidence that the information was reliable even though it was not in either the government's possession or INS' prior to January 1, 1982. Testimony of Mr. O'Reilly. There is no reason to treat the plaintiffs in this case—whose unlawful status was known to the Government prior to 1982 but not to the INS—any differently from those individuals whose unlawful status was known to their school prior to January 1, 1982 but not known to either the Government or the INS as of that date.

**B.** *Plaintiffs Will Suffer Irreparable Injury if the Challenged Regulations are not Enjoined*

Unless this court issues a preliminary injunction, plaintiffs will be irreparably injured. The evidence is clear that the INS' "known to the Government" regulations have deterred many aliens who would otherwise qualify for legalization from applying. If the current regulations remain in force, it is clear that the vast majority of these potential applicants will fail to file before the May 4, 1988 deadline—which is a scant seven weeks away. Because of INS' regulations, they reasonably believe that filing an application would be a futile act. Defendants' argument that plaintiffs are not irreparably injured because they can always protectively file for legalization in case the INS' regulations are ultimately invalidated is unacceptable. It ignores the substantial evidence that the challenged regulations have functioned to deter such filings. The deterrent effect of the regulation is exacerbated because INS is unwilling to waive the application fees for applying, which are considerable. Moreover, defendants have made it clear that there will be no refund of those fees if their interpretation of the law is upheld. The testimony shows that the individual plaintiffs are generally people without extensive financial resources. They will have a hard time

paying the application fee. It would be foolhardy for many of them to pay the filing fee while faced with INS' "known to the Government" regulation—which makes it quite clear that they will place their money at great risk. Hence, if the status quo continues, most of them will not apply for legalization. If an otherwise eligible alien does not submit an application prior to May 4, 1988, he or she may well be forever barred from applying for legalization. 8 C.F.R. § 245a.2(a). That defines irreparable injury.

### C. *The Government will Not Suffer any Harm if a Preliminary Injunction is Issued*

I reject the defendants' arguments that they will be prejudiced by an injunction. Whatever minor inconvenience they may suffer is outweighed by the substantial injury that will be suffered by organizational plaintiffs and the beneficiaries of the Act they represent. If resolution of this case is postponed, and the plaintiffs ultimately prevail in their position, they will have won a Pyrrhic victory. Whether Congress will extend the deadline to those disadvantaged is unpredictable and clearly is not an objective fact that realistically can be taken into account in my decision.

Moreover, I cannot conceive of any rational basis for the INS's insistence that the resolution of this issue be postponed. The INS's concern about the costs of "re-adjudicating" applications already rejected on "known to the Government" grounds is unpersuasive.

### D. *A Preliminary Injunction is in the Public Interest*

The issuance of an injunction is clearly in the public interest because it carries out the purposes of the Act and strikes down an interpretation of the Act that is contrary to law.

---

**20.** I want to commend counsel for the parties for the highly professional manner in which they expeditiously handled this very difficult lawsuit. The evidentiary hearing proceeded to a swift resolution because of the cooperative efforts of both counsel for the plaintiffs and the government.

### REMEDY

Because the May 4, 1988 legalization program termination date is fast approaching, it is imperative that this issue be resolved promptly. Accordingly, I am hereby granting plaintiffs' motion for Declaratory Judgment. I interpret the word "Government" as set forth in Section 245A(a)(2)(B) of IRCA to mean United States Government and not simply the INS. I declare INS' regulation to be contrary to law. I enjoin the INS from any further application of the regulation. I further order that the INS take steps to notify promptly all persons affected by the regulation in question of this court's determination. The defendants must also adopt measures to ease the filing requirements of those impacted by this court's ruling to assure that they will have the opportunity to file an application prior to the May 4, 1988 deadline.

I shall retain jurisdiction to assure this decree is carried out fully and completely and to provide such other and further relief as may be necessary to implement this decision.[20]

### SUPPLEMENTAL ORDER

A question has arisen with respect to the precise meaning of the term "unlawful status was known to the Government" as of January 1, 1982. In order to meet the statutory standard pursuant to this Court's March 30, 1988 Order, a nonimmigrant alien must establish that prior to January 1, 1982, documentation existed in one or more government agencies so that when such documentation taken as a whole would warrant the finding that the nonimmigrant alien's status in the United States was unlawful. Said documentation must be in the files of the government prior to January 1, 1982, or such other time as may be permitted by INS regulations. The bur-

I also believe that the INS is deserving of credit for the way that it has handled the legalization program entrusted to it by IRCA. Despite my holding in this case, I believe that in general the INS has taken steps to carry out the Congressional mandate.

den is on the nonimmigrant alien to meet this standard.

## SUPPLEMENTAL ORDER II

At a hearing held on April 5, 1988, plaintiffs raised a question concerning the applicability of this Court's March 30, 1988 Order to those individuals whose applications for legalization had already been administratively denied based, in whole or in part, on the Immigration and Naturalization Services' ("INS") interpretation of the phrase "unlawful status was known to the Government" as set forth in 8 C.F.R. § 245a.1(d).

Accordingly, it is hereby

ORDERED that defendants notify all individuals whose applications for legalization had been denied either by the Regional Processing Facilities or by the Legalization Appeals Unit on the basis of 8 C.F.R. § 245a.1(d) of the terms of this Court's March 30 and April 5, 1988 Orders, and it is further

ORDERED that defendants reopen, at no cost to the applicants, the cases of these individuals, and reconsider such cases under the "known to the Government" standard consistent with this Court's March 30 and April 5 and 6 Orders, and it is further

ORDERED that in the event that the employment authorization granted to these individuals has expired, defendants shall extend such employment authorization for an additional period until a final decision on the legalization application has been reached.

## SUPPLEMENTAL ORDER III

On March 30, 1988, this Court issued a Memorandum Opinion and Order in the captioned case. Subsequently, on April 4, defendants filed a "Notice of Measures To Be Taken In Response To Court's Order" and plaintiffs filed a Memorandum in Opposition thereto. A hearing was held on April 5, 1988 and following consideration of the documents filed and the arguments of counsel, Supplemental Orders were entered on April 5 and April 6, 1988. At the April 5 hearing, plaintiffs orally moved for summary judgment and both plaintiffs and de-

fendants stipulated that no material facts were in dispute and that the matters raised only issues of law. Defendants also orally moved for a stay of the Court's Order pending appeal.

Following consideration of these motions, it is hereby

ORDERED that plaintiff's motion for summary judgment is granted under the terms and conditions of the March 30, April 5 and April 6, 1988 Orders.

It is further

ORDERED that the INS is hereby permanently enjoined from any further application of the phrase "unlawful status was known to the Government," as set forth in 8 U.S.C. Section 1255a, except in conformance with this Court's Orders, and it is further

ORDERED that the defendants' motion for a stay of this Court's Orders pending appeal is hereby denied, and it is further

ORDERED that, following the date of this Order, defendants permit applicants for legalization pursuant to the "known to the Government" standard for eligibility to file their applications up to the existing May 4, 1988 deadline, or any new deadline established by Law, without the imposition of a filing fee until such time as this Order becomes a final and binding decision or the Defendants have acquiesced in this Court's rulings.

## SUPPLEMENTAL ORDER IV

Upon consideration of the oral arguments and documents presented by plaintiffs and defendants at the hearings held on April 28 and 29, 1988,

IT IS HEREBY ORDERED that the INS shall be enjoined from failing to process the legalization applications previously filed, or hereafter filed with INS, Qualified Designated Entities ("QDEs") or United States consular officers abroad on or before May 4, 1988, by nonimmigrant aliens absent from the United States whose applications for legalization had been denied by INS under INS's prior construction of the "known to the Government" provision of Section 201(a)(2)(B) of the Immigration Re-

form and Control Act of 1986 ("IRCA") or who were informed either by INS or QDEs that, based on such construction, their applications would be denied or would be recommended for denial;

IT IS HEREBY FURTHER ORDERED that such applications shall be accepted by INS without the imposition of a filing fee until such time as this Order becomes a final binding decision or the Defendants have acquiesced in this Court's rulings. In addition, INS shall accept such applications under the so-called "Bare Bones" filing procedures and shall grant temporary work authorization to such applicants in keeping with its policies respecting all other legalization applications.

IT IS HEREBY FURTHER ORDERED that INS shall continue to use its best efforts to notify all Legalization Offices and QDEs of the terms of this Order;

IT IS HEREBY FURTHER ORDERED that INS shall continue to use its best efforts to contact and to communicate the terms of this Order to the nonimmigrant aliens affected by the terms of this Order, including, without limitation, those nonimmigrant aliens whose names and addresses are contained in INS files as a result of said nonimmigrant aliens having filed a legalization application or having contacted INS with respect to the filing of a legalization application, where the INS has such information;

IT IS HEREBY FURTHER ORDERED that the INS shall parole into the United States for the purpose of filing their legalization applications any aliens and their immediate families who were deported or accepted voluntary departure as a result of the INS's prior construction of "known to the Government" requirement of Section 201(a)(2)(B) of IRCA; and

IT IS HEREBY FURTHER ORDERED that this Court shall retain jurisdiction to assure this Order is carried out fully and completely and to provide such other and further relief as may be necessary to implement this Order.

## SUPPLEMENTAL ORDER V

Upon consideration of the oral arguments presented by plaintiffs and defendants at the hearings held on April 28 and 29, 1988,

IT IS HEREBY ORDERED THAT INS shall be enjoined from denying legalization to nonimmigrant aliens who contend that they violated their nonimmigrant status prior to January 1, 1982 by failing to comply with the mandatory quarterly or annual registration requirements of Section 265 of the Immigration and Nationality Act, 8 U.S.C. § 1305 (1952), if INS determines that such aliens have credibly established their willful violation of Section 265, and such aliens have also met all other applicable conditions for legalization. With respect to any applicant making a claim based upon a violation of Section 265, INS shall be required to supply to such applicant prior to adjudication any and all agency records bearing on such claims, and the presence or absence of any such files, including but not limited to the microfilmed I–53 files now maintained by the INS for the period January 1, 1980—January 30, 1980, all of which shall be considered as evidence bearing on the credibility of the applicant's claims. These applications shall be accepted and processed by INS without the imposition of filing fee until such time as this Order becomes a final binding decision or the Defendants have acquiesced in this Court's rulings. In addition, the INS shall accept such applications under the so-called "Bare Bones" filing procedure and shall grant temporary work authorization to such applicants in keeping with its policy respecting all other legalization applications;

IT IS HEREBY FURTHER ORDERED that the INS shall continue to use its best efforts to notify all Legalization Offices and all Qualified Designated Entities of the terms of this Order;

IT IS HEREBY FURTHER ORDERED the INS shall continue to use its best efforts to contact the nonimmigrant aliens affected by the terms of this Order and to communicate the terms of this Order to such nonimmigrant aliens;

IT IS HEREBY FURTHER ORDERED that the INS will make available in Court for examination by plaintiffs on Monday May 2, 1988, Cecil Christian, Director, Records Management Board, INS or such other person or persons knowledgeable regarding INS retention of AR–11, 1–53's or data relating to same on microfilm or magnetic tape; and

IT IS HEREBY FURTHER ORDERED that this Court shall retain jurisdiction to assure this Order is carried out fully and completely and to provide such other and further relief as may be necessary to implement this Order.

### SUPPLEMENTAL ORDER VI

Upon consideration of defendants' oral motion made at the hearing on May 2, 1988, for a stay pending appeal of Supplemental Orders IV and V, issued on April 29, 1988, it is hereby

ORDERED that defendants' motion be and is denied; and

IT IS HEREBY FURTHER ORDERED that defendants retain any magnetic tapes containing information relating to the filing or failure to file AR 11 (Alien Registration) or I–53 (Annual Registration) cards, and the microfilmed files relating to the period January 1, 1980–January 30, 1980. Such tapes and files shall be retained for a period of eight months following the date of this order and a representative sample of the tape with identifying information about particular aliens deleted shall be made available to plaintiffs and shall be made a plaintiffs' exhibit in this case.

### SUPPLEMENTAL ORDER VII

On April 28, 1988, this Court granted Plaintiffs' Motion to Admit Additional Co-Counsel, which motion adopted and incorporated arguments made and evidence presented in support of Intervenors' Motion to Compel Compliance and/or Modify Permanent Injunction and the associated memorandum ("Intervenors' Motion"). On April 28, 1988 defendants filed an Opposition to Intervenors' Motion. Also on April 28, 1988 Plaintiffs filed a Notice of Evidence of defendants' Failure to Comply with the Court's Orders and Renewal of Request to Toll May 4, 1988 Filing Deadline, with Additional Declarations and Affidavits in Support thereof filed on April 29, 1988. On May 2, 1988, Plaintiffs filed a Memorandum in Reply to Defendants' Opposition to Intervenors' Motion.

On May 2, 1988 a hearing was held and testimony given by Terrance O'Reilly and Cecil Christian. At that hearing, intervenors withdrew their Motion to Intervene. Following consideration of the documents filed, the arguments of counsel, and the testimony given,

IT IS HEREBY ORDERED that Plaintiffs' request to toll the May 4, 1988 filing deadline for the class of aliens affected by this Court's prior orders be and is denied, and

IT IS FURTHER ORDERED that defendants immediately take all reasonable steps to publicize this Court's Orders of March 30, 1988, April 5, 1988, April 6, 1988, and April 29, 1988, and to encourage all aliens who may be eligible for legalization under the Court's prior orders to apply before the May 4, 1988 deadline, and

IT IS FURTHER ORDERED that defendants immediately take corrective action to notify all Legalization Offices and Regional Processing Facilities where noncompliance with this Court's prior orders has been attested to in the declaration or affidavits submitted by Plaintiffs, or where defendants independently have been informed of any noncompliance, of the proper procedure for acceptance and processing of "known to the Government" applications, pursuant to this Court's prior orders, and to eradicate any confusion which may still exist among officials at such Legalization offices and Regional Processing Facilities regarding this Court's prior orders, and make reasonable efforts to contact those aliens whose applications may not have been accepted or who were turned away as a result of such noncompliance and process the applications of such aliens, and

IT IS FURTHER ORDERED that defendants retain any information with regard to noncompliance with this Court's

orders at any time from the date of Order through and after the May 4, 1988 filing deadline, and make such information available to Plaintiffs upon demand, and

IT IS FURTHER ORDERED that this Court shall continue to retain jurisdiction to assure that this Order and all prior Orders in this case are carried out fully and completely and to provide such other and further relief as may be necessary to implement said Orders, including, but not limited to, Plaintiffs seeking relief from this Court in individual cases covered by one or more of this Court's Orders where an alien can demonstrate that he/she failed to exercise his/her right to apply for legalization by May 4, 1988 because he or she was misled directly or indirectly by the action or inaction of the INS or its agents, including, but not limited to, Qualified Designated Entities or because he/she was not allowed or dissuaded from filing an application by INS or its agents, including, but not limited to, Qualified Designated Entities, so long as relief is sought by a filing with this Court, with notice to the INS, prior to August 31, 1988, and the alien can establish that he/she is not otherwise ineligible for legalization,

IT IS FURTHER ORDERED that this Order shall be appropriately publicized by the Plaintiffs and the Defendants and,

IT IS FURTHER ORDERED that Defendants' oral motion for a stay of Supplemental Orders VI and VII be and is denied.

## SUPPLEMENTAL ORDER VIII

In an effort to effectuate and facilitate the implementation of Supplemental Order VII, it is hereby

ORDERED that the following Protective Order be entered.

1. Except as otherwise ordered by this Court, all documents, motions, affidavits, statements, declarations, forms, interrogatories, depositions, testimony, information, and pleadings produced, given, or filed under Supplemental Order VII in this action, shall be filed under seal with the Court and shall be treated as "CONFIDENTIAL INFORMATION" as outlined below.

2. "CONFIDENTIAL INFORMATION" subject to this Order shall be used solely and exclusively for purposes of this case in accordance with the provisions of this Order except as provided in this Paragraph. Such information shall not be used in or for other cases, proceedings, or disputes, or for any criminal, deportation, or other immigration-related purpose whatsoever except for any criminal proceedings arising as a result of an alien knowingly and willfully falsifying, misrepresenting, concealing, or covering up a material fact or making any false, fictitious, or fraudulent statements or representations, or making or using any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry.

3. Except with the prior written consent of the party asserting confidential treatment or prior Order of this Court, any "CONFIDENTIAL INFORMATION," and any information contained in, or derived from, any such information, may not be disclosed other than in accordance with this Order and may not be disclosed to any person other than:

   (a) All Counsel and their staffs involved in any way with this litigation;

   (b) The Court and its staff; and

   (c) Sworn officers and employees of the U.S. Department of Justice involved in processing and adjudicating legalization applications.

4. All "CONFIDENTIAL INFORMATION" obtained or received by any persons subject to this Order (including copies thereof), and all notes, drafts, memoranda, work papers, and other materials that contain data or other information obtained by means of the "CONFIDENTIAL INFORMATION" must be destroyed, returned to counsel for the other party, or retained in accordance with this Order. If destroyed, or retained, counsel shall, within a reasonable time, provide the Court with a declaration to that effect.

5. The inadvertent or unintentional disclosure of "CONFIDENTIAL INFORMATION" shall not be construed to be a waiver of confidentiality.

6. A breach of the provisions of this Protective Order shall be subject to sanctions, in the discretion of the Court.

7. The provisions of this Protective Order shall remain in force after the entry of final judgment (including any appellate proceedings).

## SUPPLEMENTAL ORDER IX

On June 6, 1988, a hearing was held concerning the procedures for implementing this Court's Supplemental Order VII with respect to those aliens affected by the Court's prior orders who did not file by the May 4, 1988 legalization deadline. Following consideration of the documents filed and the arguments of counsel,

IT IS HEREBY ORDERED that defendants immediately provide one copy of the attached form and press release, which are hereby approved, to all major wire services and to all Qualified Designated Entities; and

IT IS FURTHER ORDERED that plaintiffs immediately provide one copy of the attached form and press release to *Interpreter Releases* and to the American Immigration Lawyers Association; and

IT IS FURTHER ORDERED that, within five (5) business days of receipt from plaintiffs, defendants shall provide the copies of the forms and press releases which have been supplied by plaintiffs to (i) all legalization offices remaining open following the date of this Order and (ii) all INS district offices, and sub-district offices. Defendants shall notify plaintiffs promptly when the supply of forms and press releases at any of such offices has been exhausted; and

IT IS FURTHER ORDERED that the distribution of such forms and press releases shall be exempt from the requirements of the Paperwork Reduction Act of 1980 (44 U.S.C. 3501 *et seq.*), including, without limitation, the requirement of approval by the Office of Management and Budget;

IT IS FURTHER ORDERED that nothing in this Order shall be construed in any way as requiring defendants to provide assistance or counseling to aliens or to their representatives with respect to the forms or press releases.

# APPENDIX

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AYUDA, INC. et al.,<br><br>                **Plaintiffs**<br><br>    v.<br><br>EDWIN MEESE III, et al.,<br><br>                **Defendants** | **Civil Action No. 88-0625**<br>**Judge Stanley Sporkin**<br><br>**Statement of Reasons for Not Applying for Legalization Prior to May 5, 1988 And Statement Of Eligibility For Legalization** |

**Applicant:** Do not write above this line. If you need more space to answer fully any question on this form, use a separate sheet and identify each answer with the number of the corresponding question. *Fill in with typewriter or print in block letters in ink.* **THE INFORMATION PROVIDED IN THIS APPLICATION IS CONFIDENTIAL AND MAY ONLY BE USED TO MAKE A DETERMINATION ON THE ELIGIBILITY OF THE APPLICANT TO FILE A LATE APPLICATION FOR LEGALIZATION.**

1. I hereby provide the following statement of reasons why I did not apply for legalization prior to May 5, 1988. I entered the U.S. as a nonimmigrant prior to January 1, 1982 and my unlawful status was known to the Government as of January 1, 1982 because

☐ I willfully failed to file annual or quarterly reports with the INS prior to 1982.

☐ A document or documents existed prior to January 1, 1982 in the files of one or more governmental agencies that indicated my unlawful status.

2. Name (Last, First, Middle Initial)

3. Date of Birth

4. Other names known by

5. Telephone Numbers
Home:      Work:

6. Home address in the U.S.

7. Mailing address in the U.S.

8. Country of Citizenship

9. Place of Birth

10. Have you previously applied for legalization?
☐ No      ☐ Yes (if "Yes" give date, place of filing, and final disposition, if known)

11. Do you have any records with INS?
☐ No    ☐ Yes    ☐ Don't Know
If yes, give number(s)
A -
Other

12. When was your last entry prior to January 1, 1982?

13. Manner of Entry (Visitor, Student, Crewman, etc.)
☐ With visa    ☐ Without visa

14. Type of Visa Entered on Prior to January 1, 1982

15. Date Authorized Stay in U.S. Expired Prior to January 1, 1982

16. What dates were you absent from the United States after January 1, 1982?

17. I did not exercise my right to apply for legalization before May 5, 1988, because

☐ An agent of the INS at _____ (location) informed me, or my representative or attorney, who informed me, that I was not eligible to apply because my illegal status in this country before January 1, 1982 was not known to the INS  The agent's name, if known, was _____. The name of my representative or attorney, if applicable, was _____.

☐ An employee at Qualified Designated Entity _____ (name of QDE) located at _____ informed me, or my representative or attorney, who them informed me, that I was not eligible to apply because my illegal status before January 1, 1982 was not known to the INS.  The employee's name, if known, was _____. The name of my representative or attorney, if applicable, was _____.

☐ I was not aware that the regulation making me ineligible for legalization was invalidated because (explain) _____

☐ Other (explain) _____

18. Did you learn that you were eligible to apply for legalization before May 5, 1988?
    ☐ Yes    ☐ No

    If yes, why did you fail to apply?

19. To the best of my knowledge and belief I am not otherwise ineligible for legalization.

I declare under penalty of perjury that the foregoing is true and correct.

Applicant (Signature) _____

Date _____

## CERTAIN ILLEGAL ALIENS MAY STILL APPLY FOR AMNESTY
### (Washington, D.C.)

This release is addressed to those illegal nonimmigrant aliens who were led to believe that they had no right to seek amnesty under the Immigration Reform and Control Act, which by its terms expired May 4, 1988.  Federal Judge Stanley Sporkin in Washington, D.C. ruled that before midnight, August 31, 1988, certain nonimmigrant aliens whose unlawful immigration status was "known to the Government"

before January 1, 1982, may seek permission to file a late application for amnesty with the United States District Court for the District of Columbia. Applicants must show they were misled directly or indirectly by the INS or its agents, including Qualified Designated Entities (QDE's) or not allowed to apply or dissuaded from applying for legalization by INS or its agents, including QDE's. Judge Sporkin stated that the burden is on the applicant to establish eligibility for legalization.

For example, one group of potentially eligible aliens are those who worked illegally in violation of a student visa or other work-restricted visa, if a tax return, social security form, or some other record of employment was on file with the government agency before January 1, 1982. Another group includes all nonimmigrant aliens who willfully failed to file annual or quarterly alien registration reports with the government prior to 1982. In addition, there are other ways the alien could have violated his or her visa.

Aliens who believe they may be eligible for amnesty under the Court's ruling must submit declarations to be filed with the Court by plaintiffs' counsel explaining why they missed the May 4, 1988, amnesty application deadline. Those declarations must establish one of these reasons for not applying: either (1) the INS, or any of its agents, such as a Qualified Designated Entity advised the alien that he or she would not qualify or turned away the applicant; or (2) the INS or any of its agents misled the alien; or (3) the alien was not aware of the changes in the INS regulation making him/her eligible for amnesty. Judge Sporkin emphasized that all requests for amnesty after the deadline will be maintained in confidence, and that the information contained in those requests may not be used by the INS to initiate or support any deportation proceeding even if the alien's application is later denied.

The plaintiffs' lawyers in the case, entitled *Ayuda v. Meese*, have prepared a form that is available, free of charge, to all nonimmigrant aliens who believe they may be eligible and who wish to show that they are eligible to apply for amnesty. Copies of these forms may be obtained by contacting any INS Legalization Office, plaintiffs' attorneys, any Qualified Designated Entity, or an immigration counselling group. Requests by mail should include a stamped self-addressed envelope. Completed forms must be received by plaintiffs' lawyers before the end of August for submission to the Court.