**In re Richard THORNBURGH, et al., Petitioners.**

**No. 88–5360.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 27, 1989.

Decided March 3, 1989.

Edward R. Cohen, Atty., U.S. Dept. of Justice, with whom Barbara L. Herwig, Atty., U.S. Dept. of Justice, Washington, D.C., was on the petition for a writ of mandamus, for petitioners.

Lloyd N. Cutler, with whom Stephen W. Preston, Washington, D.C., was on the re-sponse to the petition for a writ of mandamus, for respondent.

Wayne H. Matelski, Lynda S. Zengerle, Carolyn Waller, Washington, D.C., Deborah Sanders, Washington, D.C., Michael Rubin, Stephen Berzon, Altschuller and Berzon, San Francisco, Cal., entered appearances, for plaintiffs Ayuda, Inc., et al.

Before WALD, Chief Judge, MIKVA, Circuit Judge, and GREENE,[*] District Judge.

Opinion for the court filed by Chief Judge WALD.

WALD, Chief Judge:

Petitioners, Richard Thornburgh et al.,[1] are defendants in an action now pending in the district court, in which four organizations and five "Doe" individual aliens ("plaintiffs"), purporting to represent a class of similarly-situated aliens, challenged a regulation of the Immigration and Naturalization Service ("INS") and sought remedies for alleged injuries to their rights as a consequence of the allegedly invalid regulation. Having ruled that the INS regulation was invalid, the district court entered two orders of referral to one or more special masters, instructing them to compile certain information about aliens adversely affected by the invalid regulation and to recommend what sort of relief, if any, the district court should order for the affected plaintiffs. Petitioners now seek a writ of mandamus directing the district court to withdraw the reference to special masters. It is conceded by the petitioners themselves that such a writ of mandamus may properly issue only if there is no conceivable form of relief that the district court could afford to the affected aliens. Because at this juncture in this case we cannot with confidence rule out the possibility of some valid relief ensuing from the masters' information-gathering and recommending functions, we deny the mandamus petition.

---

[*] The Honorable Harold H. Greene, of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

[1] Petitioners are the Attorney General, the Commissioner of the Immigration and Naturalization Service (INS), and the INS.

## I. Background

This proceeding arises out of *Ayuda, Inc. v. Thornburgh,* C.A. No. 88–00625 (D.D.C. filed March 8, 1988). Plaintiffs filed suit in *Ayuda* to challenge an INS regulation issued pursuant to the Immigration Reform and Control Act of 1986, Pub. L. No. 99–603 ("IRCA"). Among the major features of IRCA was an "amnesty" provision allowing the legalization of resident status for certain aliens who entered the United States (lawfully or unlawfully) before January 1, 1982, and who have resided in the United States in an unlawful status since that date. IRCA established a 12–month period to be designated by the Attorney General, beginning no later than May 5, 1987, in which such aliens could apply for adjustment of their status. 8 U.S.C. § 1255a(a)(1)(A). The Attorney General designated May 5, 1987, as the starting date, and the deadline for applications as May 4, 1988. 8 C.F.R. § 245a.2(a)(1) (1988).

The IRCA provision at issue in *Ayuda* concerns "nonimmigrants," persons who entered the United States lawfully but later violated restrictions on their status. Under IRCA, those nonimmigrants can qualify for amnesty only by establishing either (1) that their authorized stay expired through the passage of time before January 1, 1982, or (2) that their "unlawful status was known to the Government as of [January 1, 1982]." 8 U.S.C. § 1255a(a)(2)(B).

The challenged INS regulation defined "Government" in the foregoing provision to mean "the Immigration and Naturalization Service." 8 C.F.R. § 245a.1(d). In their complaint, plaintiffs sought a declaratory judgment that the regulation was invalid and that a nonimmigrant's unlawful status was "known to the Government" if it was known to any federal department, bureau or agency. Plaintiffs sought to have a plaintiff class certified and requested that the court issue orders (a) requiring petitioners to promulgate corrected regulations and notify members of the plaintiff class; (b) tolling the May 4, 1988, deadline to allow class members a full 12–month period in which to apply under corrected regulations; and (c) granting further relief as appropriate.

On March 30, 1988, United States District Judge Stanley Sporkin ("respondent") entered a declaratory judgment interpreting the statutory term "Government" to mean "the United States Government and not simply the INS" and declaring 8 C.F.R. § 245a.1(d) to be invalid. *Ayuda, Inc. v. Meese,* 687 F.Supp. 650, 666 (D.D.C.1988). At the same time, respondent ordered the INS to "take steps to notify promptly all persons affected by the regulation in question of this court's determination" and to adopt measures to ensure that those aliens would have an opportunity to file timely applications in the 39 days remaining before the May 4 deadline. *Id.*

In the weeks following the March 30 ruling, respondent entered a series of supplemental orders. Orders entered on April 6 and 7 (Supplemental Orders I, II and III) clarified the March 30 ruling and enforced it by, *inter alia,* ordering the INS to reopen the cases of alien applicants who had been turned away as a result of 8 C.F.R. § 245a.1(d). 687 F.Supp. at 666–67. The defendants (petitioners here) did not appeal those orders, nor did they appeal the March 30 ruling itself.

On April 28, plaintiffs moved for an order tolling the statutory deadline and submitted evidence purporting to show that the INS had failed to comply with the district court's prior notification and reprocessing orders. On May 2 and 4, respondent entered three orders (Supplemental Orders IV, V and VI) further implementing the court's ruling. 687 F.Supp. at 667–69. In particular, Supplemental Order V ordered the INS, for the first time, to accept applications from "known to the Government" aliens whose unlawful status as of January 1, 1982, stemmed from their willful violation of the mandatory reporting requirements of § 265 of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1305 (repealed Dec. 29, 1981).

On May 4—the last day in the 12–month designated filing period—respondent entered Supplemental Order VII, which de-

nied "[p]laintiffs' request to toll the May 4, 1988 filing deadline for the class of aliens affected by this Court's prior orders." 687 F.Supp. at 669. At the same time, however, the court retained jurisdiction to provide any relief that might be appropriate, "in individual cases ... where an alien can demonstrate that he/she failed to exercise his/her right to apply for legalization by May 4, 1988, because he or she was misled directly or indirectly by the action or inaction of the INS or its agents." 687 F.Supp. at 670.

The district court subsequently moved to ascertain the identities of any aliens so misled. On June 9, in Supplemental Order IX, Judge Sporkin prescribed a form on which aliens affected by his ruling could submit sworn statements indicating their reasons for not applying before the deadline. 687 F.Supp. at 671–74. These "Statement of Reasons" forms were to be filed in the district court by plaintiffs' counsel.

Petitioners initiated an appeal to this court on July 5 from certain parts of Supplemental Orders IV, V and VII. The appeal raised, *inter alia,* the question of whether the district court could properly retain jurisdiction to provide further relief to aliens who failed to meet the May 4 deadline. *See* Notice of Appeal, ¶ 3, Respondent's Appendix F; Statement of Issues to be Raised on Appeal, ¶ 7, Respondent's Appendix G. This particular question (among others) was subsequently withdrawn from the appeal by petitioners. Defendants–Appellants Motion for Partial Withdrawal of Appeal, Respondent's Appendix H. The appeal, which now centers on the Supplemental Order V command that the INS accept applications from aliens whose unlawful status stemmed from their willful violation of INA § 265, is still pending. *Ayuda, Inc. v. Thornburgh,* No. 88–5226 (D.C.Cir. filed July 18, 1988).

After a number of completed "Statement of Reasons" forms were filed in the district court, respondent issued Supplemental Order XI on September 27, 700 F.Supp. 49, stating his intention to appoint one or more special masters and prescribing their functions. The special masters would determine whether each alien "was in fact injured, prejudiced or misled by the Government's impermissible definition of 'known to the Government,'" and would submit to the court their findings in this regard as well as recommendations for any relief that might be legally provided to the alien. Respondent's Appendix D at 4. The court deferred consideration of whether to certify a plaintiff class pending the conclusion of the special masters' inquiry. *See id.* at 8. At the same time, the court "held in abeyance" its Supplemental Order VII, which had refused to toll the statutory deadline. *Id.* On October 28, in Supplemental Order XII, 700 F.Supp. 49, the court appointed a lead special master. Respondent's Appendix E.

Petitioners filed the present petition for mandamus in this court on November 18. The petition seeks a writ of mandamus directing the district court to withdraw those provisions of Supplemental Orders XI and XII that establish and implement a reference to special masters.

## II. Mandamus Standards

This court's authority to issue a writ of mandamus is derived from the All Writs Act, 28 U.S.C. § 1651(a), which empowers federal courts to issue "all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

Mandamus, we are all aware, is a drastic remedy, " 'to be invoked only in extraordinary situations.' " *In re Halkin,* 598 F.2d 176, 198 (D.C.Cir.1979), quoting *Kerr v. District Court,* 426 U.S. 394, 402, 96 S.Ct. 2119, 2123, 48 L.Ed.2d 725 (1976). It is traditionally used only when necessary to prevent an inferior court from operating outside its prescribed jurisdiction. *Halkin,* 598 F.2d at 198. It is not to be used merely to stop a judge mid-trial from making an error that can later be corrected on appeal. Rather, the writ may issue only "to correct those exceptional circumstances where there has been a 'clear abuse of discretion or usurpation of judicial power.' " *Halkin,* 598 F.2d at 198, quoting *Bankers Life & Casualty Co. v. Holland,*

346 U.S. 379, 383, 74 S.Ct. 145, 148, 98 L.Ed. 106 (1953).

A strong congressional policy against piecemeal appeals permeates the federal judicial system. *See Parr v. United States*, 351 U.S. 513, 520–21, 76 S.Ct. 912, 917–18, 100 L.Ed. 1377 (1956). Appeal from a final judgment is the standard means of redressing erroneous rulings by lower courts.[2] Because of the discretionary nature of a mandamus writ, *United States v. Poindexter*, 859 F.2d 216, 222 (D.C.Cir.1988), a successful petitioner for mandamus normally must demonstrate that "appeal is a clearly inadequate remedy" for the alleged error, *Halkin*, 598 F.2d at 198, quoting *Ex parte Fahey*, 332 U.S. 258, 260, 67 S.Ct. 1558, 1559, 91 L.Ed. 2041 (1947), and that she would be irreparably harmed by being forced to await relief under appeal. *Halkin*, 598 F.2d at 198. Additionally, the petitioner must demonstrate that her right to relief is "clear and indisputable," *Kerr v. District Court*, 426 U.S. at 403, 96 S.Ct. at 2124, and that nothing that might happen later in the proceeding could change the inevitability of her success. Even where the petitioner challenges the district court's basic determination that it has jurisdiction over the case, a court of appeals should be "reluctant to interfere" with the district court's determination so long as it is reviewable in the regular course of appeal. *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26, 63 S.Ct. 938, 941, 87 L.Ed. 1185 (1943); *Ex Parte Harding*, 219 U.S. 363, 378–80, 31 S.Ct. 324, 329–30, 55 L.Ed. 252 (1911) (mandamus is available to redress district court's erroneous refusal to remand case to state court only where no appeal would ever lie); *Hernandez–Agosto v. Romero–Barcelo*, 748 F.2d 1, 4–5 (1st Cir.1984) (even given "fair-ly obvious" lack of subject-matter jurisdiction, mandamus should issue "only in exceptional circumstances").[3]

### III. PETITIONERS' CONTENTIONS

Petitioners make several arguments to bring themselves within the narrow confines of mandamus as a remedy designed only for clear-cut violations of a court's basic jurisdiction. *First*, petitioners argue that "[i]t is well-settled" that an improper reference to a special master is a sufficiently fundamental violation of jurisdiction as to be redressable by writ of mandamus. *Second*, they claim that the aspects of *Ayuda* referred to the special masters do not constitute a "case or controversy" within the meaning of Article III of the Constitution, so that the district court has no jurisdiction over them. *Third*, they contend that IRCA permits individual aliens to challenge denial of legalization only in petitions for review of their deportation proceedings, not in the context of an affirmative suit to invalidate a regulation. *Fourth*, they argue that there is no relief that the special masters could possibly recommend as a result of their inquiry that the district court has any power to grant. This last point, we believe, is the crux of petitioners' case, and presents the most difficult issue. We will accordingly deal first with petitioners' other three contentions.

### A. Erroneous References to Special Masters

■ Petitioners rely on *La Buy v. Howes Leather Co.*, 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957), for the proposition that mandamus lies to correct an improper reference to special masters. *La Buy*, however, involved conduct by a district judge

---

**2.** Congress has provided for a narrow class of exceptions to the rule. *See, e.g.,* 28 U.S.C. § 1292(a), (b).

**3.** *See also First Jersey Securities, Inc. v. Bergen*, 605 F.2d 690, 700 (3d Cir.1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980) (having established that district court lacks subject-matter jurisdiction, petitioner "faces the additional hurdle of showing that mandamus is the appropriate remedy"); *Bancohio Corp. v. Fox*, 516 F.2d 29, 33 (6th Cir.1975) ("Issuance of the writ is appropriately denied where the question of [subject-matter] jurisdiction is factually and legally difficult."); *Belcher v. Grooms*, 406 F.2d 14, 16–17 (5th Cir.1968) (refusing to issue writ because district court did not clearly lack jurisdiction; jurisdictional issue is "to be decided in the pending appeal under normal and ordinary appellate procedures, upon detailed consideration of the record, and application of established standards of judicial review").

of a wholly different stripe from that challenged in this case. The district court in *La Buy* referred entire trials of complex cases to a special master for final disposition, causing the Supreme Court to characterize his action as an "abdication of the judicial function," and to roundly condemn the use of a master "to displace the court." 352 U.S. at 256, 77 S.Ct. at 313. Such an abdication of the total judicial power unquestionably rose to the level of an extraordinary abuse of discretion by a judge, a "palpably improper" action, and the "practical[ ] nullifi[cation]" of the judge's duty. *Id.*

The petitioners in this case certainly do not accuse the respondent of any such improper delegations to a master of inherently judicial functions; the masters' task is only to collect information and make recommendations for relief. *See* Supplemental Order XI at 4–8. There is no question but that Judge Sporkin has "retain[ed] decisional authority over the issue in question." *In re U.S. Department of Defense*, 848 F.2d 232, 239 (D.C.Cir.1988). *See* Petition at 16 (petitioners' argument is a challenge to the powers of the district judge himself).[4] Nothing in *La Buy* suggests that mandamus is any more appropriate, *generally*, to correct errors relating to the appointment of special masters than to correct other kinds of error. Indeed, absent the *La Buy* problem of "untoward or irretrievable delegation of judicial authority," this court has been reluctant to "interfere[ ] with [a district judge's] trial management" by issuing a mandamus writ ordering that a special master reference be vacated. *See In re U.S. Department of Defense*, 848 F.2d at 237, 238–39 (refusing to issue writ); *see also* 5A J. Moore & J. Lucas, *Moore's Federal Practice*, ¶ 53.05[3]

(2d ed. 1988). In the final analysis, mandamus lies only if the petitioners are right about their fourth point—that there exists no jurisdiction in the court itself to provide any additional relief to the aliens injured by the invalid regulation.

### B. Case or Controversy

#### 1. *Mootness*

■ Petitioners argue that *Ayuda*, at this juncture, does not present a case or controversy; the government no longer contests the invalidity of the regulation and there are no longer any parties before the district court still seeking relief. Petition at 8. Petitioners contend that the four organization plaintiffs have no cognizable interest in the possibility of further relief for individuals, and the five individual "Doe" plaintiffs presumably filed amnesty applications immediately after the district court's March 30 invalidation of the regulation and so met the May 4 deadline. Thus, say petitioners, all claims before the court have been either satisfied or rendered moot. Petition at 8 & n. 15. The possibility that other "known to the Government" aliens may exist who did not file by the May 4 deadline because of the government's wrongful action does not create a live case or controversy, since they are not parties to the action. The district court has not yet ruled on the plaintiffs' motion for class certification. Petition at 8.

Even assuming that the claims of the "Doe" plaintiffs are moot,[5] the district court is not necessarily deprived of all jurisdiction over the action. To begin with, the four organization plaintiffs arguably continue to have a justiciable interest in the outcome of the special masters' inquiry.[6]

---

4. At oral argument, counsel for petitioners confirmed that their objections based on the limits of the district court's jurisdiction apply equally to the district judge himself and to the special masters.

5. Plaintiffs do not deny that the five "Doe" plaintiffs filed individual applications between March 30 and May 4; they say only that the record does not reflect whether they did. Petitioners reply, logically, that whether the "Doe" plaintiffs filed by May 4, rendering their indi-

vidual claims moot, is knowledge available only to plaintiffs' counsel. In the absence of a denial of such filing by plaintiffs, we can reasonably assume they did.

6. Petitioners contend that the organization plaintiffs are no longer aggrieved, Petition at 17, and that the claims of the organization plaintiffs "have nothing to do with the reference" to special masters. Reply at 4. In order to establish standing in its own right, an organization must meet the three constitutional components—inju-

Moreover, plaintiffs have moved to amend their complaint to add as named plaintiffs individuals who failed to file by May 4, and they have moved for certification of a class that includes such persons. The district court has indicated that it will rule on both motions after receiving the results of the special master inquiry. *See* Respondent's Appendix D at 8. There is authority to the effect that a court may respond to the pre-certification mooting of a class representative's claims by permitting substitution of a new class representative. *See Samuels v. District of Columbia*, 770 F.2d 184, 193 n. 5 (D.C.Cir.1985) (where plaintiffs allege that defendant "*systematically* [violated the law] ... on a *classwide* basis*," pre-certification mooting of named plaintiffs' claims "does not moot such a class action claim") (emphasis in original); *Basel v. Knebel*, 551 F.2d 395, 397 n. 1 (D.C.Cir.1977) ("Whether or not the challenged regulations raise a live controversy with regard to appellant's individual claim, it is clear that a live controversy exists with regard to class members who are currently being denied prior hearings as a result of the regulations."); *Swan v. Stoneman*, 635 F.2d 97, 102 n. 6 (2d Cir. 1980) ("To the extent that appellants' argument is that Swan's death does not moot the class claim if one of the proposed inter-

venors can be substituted as a named plaintiff, we agree."); *Silva v. Vowell*, 621 F.2d 640, 650 (5th Cir.1980) ("Once the [named plaintiffs'] challenge became moot and put the named plaintiffs' standing in question, the plaintiffs and the judge should have realized that intervention by another named plaintiff was appropriate"; case remanded to district court to allow "an appropriate named plaintiff [to] intervene."), *cert. denied*, 449 U.S. 1125, 101 S.Ct. 941, 67 L.Ed.2d 111 (1981); *Rivers v. Califano*, 86 F.R.D. 41, 45–46 (S.D.N.Y.1980) (permitting intervention of new plaintiffs with live claims, and granting class certification); *see also* H. Newberg, *Newberg on Class Actions* §§ 2.25–2.26 (2d ed. 1985 & Supp. 1988). Such action is especially appropriate where the events causing mootness have only individual rather than classwide impact. H. Newberg, *supra*, § 2.23. Here, while we assume that the named parties were apprised of the March 30 ruling by their lawyers, the same assumption cannot be made as to other members of the putative class. Because plaintiffs' counsel have proposed the intervention of several new plaintiffs with allegedly live claims, we decline to issue mandamus on the premise that the entire case should be dismissed due to the mooting of the named plaintiffs' claims.[7]

ry-in-fact, causation and redressability—as well as the prudential rule that the injury must be arguably within the zone of interests protected or regulated by the law on which the complaint is founded. *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 936 (D.C.Cir.1986). The alleged injury in this case—that the petitioners' actions have denied the plaintiff organizations the information and avenues of redress they wish to use in their routine information-dispensing, counseling, and referral activities—is arguably similar to the injuries found sufficient in *Action Alliance*, 789 F.2d at 937–38, and in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982). Here, the organizations claim (among other things) that their ability to render accurate advice is hindered by the ambiguous legal status of "known to the Government" aliens whose applications were discouraged by the INS's misreading of the law. *Ayuda*, 687 F.Supp. at 655–56. The causation and redressability tests appear to present no difficulty, because the organizations' injury does not result from the actions of third parties not before the court. *See Action Alliance*, 789 F.2d at 938. As for the prudential

zone-of-interests test, the organizations' interests include the "promotion of the knowledge, enjoyment, and protection of the rights created by" IRCA. *Id.* at 939; *see also Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 399–400, 107 S.Ct. 750, 757–58, 93 L.Ed.2d 757 (1987). Thus, although we do not decide finally whether organizational standing exists in this case, we cannot find either that its nonexistence is clear enough to warrant mandamus.

**7.** Some courts have gone a step further and have permitted the original named plaintiffs *to represent the class* even after their own claims were mooted prior to certification. *See Wilkerson v. Bowen*, 828 F.2d 117, 121 (3d Cir.1987); *White v. Mathews*, 559 F.2d 852, 857–58 (2d Cir.1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978); *see also* H. Newberg, *supra*, § 2.27. These cases extend the logic of *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980), which permitted a named plaintiff, whose own claim was mooted after the district court denied class certification, to represent the class in appealing the denial of class certifica-

Petitioners argue that the existence of a viable plaintiff with a genuine case or controversy must be determined as of the time the court ordered a reference to special masters. But that, so far as we can tell, is not an absolute requirement: a court has jurisdiction to determine whether it has jurisdiction. *Ilan–Gat Engineers, Ltd. v. Antigua Int'l Bank,* 659 F.2d 234, 239 (D.C.Cir.1981) (court has power to compel discovery on jurisdictional issues, to ascertain whether it has subject matter jurisdiction). Thus, it is inaccurate to suggest that the existence of Article III jurisdiction must be absolutely certain as of the moment the disputed reference is made. To be sure, there are limits on the extent of time and effort that may properly be expended to ascertain the existence of a case or controversy. But we emphasize that this is not a case in which plaintiffs' counsel seek to use the power of the courts, through the discovery rules, to go fishing for a named plaintiff to replace ones whose claims were mooted. *Cf. Reed v. Bowen,* 849 F.2d 1307, 1313–14 (10th Cir.1988) (affirming a refusal to permit additional discovery in such circumstances). Nor is it even a case in which plaintiffs' counsel ask the courts to keep the suit alive for a period of time while they seek intervenors on their own. *See Goodman v. Schlesinger,* 584 F.2d 1325, 1332–33 (4th Cir.1978) (allowing counsel a "reasonable time" to find new plaintiffs with live claims); *Cox v.*

*Babcock & Wilcox Co.,* 471 F.2d 13, 15–16 (4th Cir.1972) (same). Here, plaintiffs' counsel have submitted the names of actual persons seeking representative status who allege they have a continuing personal stake in the case and in whatever further relief may be appropriately awarded. The court in turn apparently is waiting to see if any relief is possible and if there are sufficient aliens eligible for such relief to justify a class action. While one could debate about which should come first, party substitution and class certification, or relief recommendations, we do not believe the sequence followed here constituted an abuse of the court's case or controversy jurisdiction so as to invoke mandamus. Nor is it problematic that the district court originally reserved decision on the standing of the individual plaintiffs.[8] Mandamus would be proper only if the individuals clearly lacked standing; since that is not the case, and since petitioners' standing and mootness arguments can be reasserted on appeal, the district court's postponement of decision on the matter does not justify issuance of the writ now.

### 2. *Redressability*

Petitioners alternatively assert that even if there are persons in the wings willing to continue the action who missed the May 4 deadline, they have no standing to sue: this is because the district court lacks the power to grant any relief to such

---

tion. The *Wilkerson* and *White* cases permitted plaintiffs whose claims were mooted prior to a district court's ruling on class certification to continue serving as class representatives throughout the course of the action. Holding that a plaintiff in such circumstances is not "automatically" disqualified from being class representative, the Third Circuit in *Wilkerson* stated that "the question still must be decided whether, all other factors being considered, the plaintiff can fairly and adequately represent the class and meet the other requirements of Fed.R. Civ.P. 23." 828 F.2d at 121. There is some indication in the caselaw, however, that such treatment is proper only in special circumstances, such as where the alleged law violation is capable of repetition, yet evading review. *See, e.g., Valentine v. Secretary of Health & Human Services,* 542 F.Supp. 76, 78–79 (N.D.Cal.1982). At any rate, our determination that *Ayuda* continues to present a case or controversy does not depend on the named plaintiffs' continued sta-

tus as class representatives. Substitution of new class representatives may well be the better course. At this juncture, all we decide is that the entire action is not moot.

8. 687 F.Supp. at 660 n. 9. The court also reserved decision on the standing of the four organizations to assert the interests of individual aliens. *Id.* Since the organizations do not enroll aliens as members, the argument for such "associational" standing is a weak one here. *See Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 344–45, 97 S.Ct. 2434, 2441–42, 53 L.Ed.2d 383 (1977) (associational standing held to exist where individuals "possess all of the indicia of membership" in the plaintiff organization); *American Legal Foundation v. FCC,* 808 F.2d 84, 89–91 (D.C.Cir.1987) (question is whether organization "is the functional equivalent of a traditional membership organization").

persons (our fourth point again) and as a consequence, they cannot meet the "redressability" prong of the constitutional standing test. Petition at 17. Even assuming that the former assertion is correct,[9] the latter assertion does not accurately reflect standing doctrine.

Redressability is indeed one of the three elements of standing imposed by the "case or controversy" requirement of Article III of the Constitution. A party seeking redress from a federal court must demonstrate (1) some actual or threatened injury that (2) fairly can be traced to the challenged action and (3) "is likely to be redressed by a favorable decision." *National Wildlife Federation v. Hodel*, 839 F.2d 694, 704 (D.C.Cir.1988), quoting *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). The redressability prong of the test deprives the courts of jurisdiction over cases in which the likelihood that the requested relief would redress the plaintiff's injury is "only speculative." *Linda R.S. v. Richard D.*, 410 U.S. 614, 618, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973).

Petitioners contend that, if the court lacks power to grant the requested relief, "there is no substantial likelihood that the federal court could redress the injury complained of." Petition at 17. But the redressability prong of the standing test is not an inquiry into the scope of the court's power to grant relief. It does not ask whether it is likely "that the court's determination would provide the ultimate relief sought." *Id.* Rather, the test *assumes* that a decision on the merits would be favorable and that the requested relief would be granted; it then goes on to ask whether that relief would be likely to redress the party's injury. *See Linda R.S. v. Richard D.*, 410 U.S. at 618, 93 S.Ct. at 1149 ("if [plaintiff] were granted the requested relief," her injury probably would not be redressed); *Common Cause v. Department of Energy*, 702 F.2d 245, 252 (D.C.Cir.1983) (requested relief probably would not redress plaintiffs' injury, "assum[ing] ... that a decree ordering such action would be a proper exercise of judicial power"). *See also Allen v. Wright*, 468 U.S. 737, 753 n. 19, 104 S.Ct. 3315, 3325 n. 19, 82 L.Ed.2d 556 (1984) (redressability test "examines the causal connection between the alleged injury and the judicial relief requested").

In sum, the redressability test asks whether a plaintiff's injury would be likely to be redressed *if the requested relief were granted.* To analyze standing by asking whether the relief would be likely to be granted, as petitioners would have us do, would conflate the redressability test with a motion to dismiss for lack of jurisdiction. We examine below the petitioners' assertion that no relief is available in this case; we decline, however, to conduct that analysis under the rubric of standing doctrine. In the end, even if petitioners were right about their redressability argument, it would still depend on the validity of their predicate—that no relief is possible—and the redressability argument is in that sense duplicative.

### C. Statutory Limits on Judicial Review

■ In addition to alleging the lack of a case or controversy, petitioners say the district court has no jurisdiction to provide relief to individual plaintiffs because separate provisions in IRCA govern judicial review of denials of legalization under the amnesty provision.

IRCA provides that "[t]here shall be judicial review of ... a denial [of legalization] only in the judicial review of an order of deportation." 8 U.S.C. § 1255a(f)(4)(A). Since *Ayuda* does not contest particular orders of deportation, petitioners argue that the plaintiffs' pleas for relief to aliens affected by the invalid regulation cannot be adjudicated as part of this action. Petitioners also assert that, under the statute, judicial review of deportation orders can take place only in U.S. Courts of Appeals after

---

**9.** We explore at more length, and finally reject, this proposition, *infra*, Part IV.

the alien has exhausted her administrative remedies.[10]

Emphasizing that the strict standards of mandamus constrain us to withhold the writ unless the district court's lack of jurisdiction is "clear and indisputable," we reject petitioners' contentions. The IRCA judicial review provisions cited refer to "review of a determination respecting an application for adjustment of status." 8 U.S. C. § 1255a(f)(1). The referral orders do not invoke review of any determination respecting applications for legalization; they involve fact finding and recommendations as to relief required by the invalidation of a regulation promulgated under the IRCA. The gravamen of the complaint insofar as it involves adjustment applications at all is that some aliens were improperly deterred from filing applications as a result of the invalid regulation. The referral is to determine who those aliens are, what their situation is and whether the district court can do anything further to assist them. It does not appear to contemplate any review of "a determination respecting an application for adjustment of status." Ample authority supports the proposition that the district court has federal question jurisdiction to entertain a statutory or constitutional challenge to the manner in which the entire IRCA amnesty program is being operated. 28 U.S.C. § 1331(a) (federal question jurisdiction); 8 U.S.C. § 1329 (jurisdiction over "all causes ... arising under any of the provisions of this subchapter," which includes 8 U.S.C. § 1255a). *See UAW v. Brock,* 477 U.S. 274, 106 S.Ct. 2523, 2530, 91 L.Ed.2d 228 (1986); *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 106 S.Ct. 2133, 2138, 90 L.Ed.2d 623 (1986).[11] While we in no way foreclose petitioners from reasserting the IRCA argument in a direct appeal, where they will not have to meet the rigorous "clear and indisputable" standard, our reading of the IRCA review provisions as a ground for mandamus leads us to conclude that they do not clearly remove jurisdiction from the district court for all future relief.

## IV. THE PANGILINAN DECISION

If a mandamus writ is to be issued in this case, it must be on the ground that a federal court has no authority to do anything further by way of relief for aliens who missed the application deadline because of their ignorance of their eligibility due to the government's misconstruction of and even misinformation about the statutory requirements. Petitioners rely on *INS v. Pangilinan,* —— U.S. ——, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988), to support this draconian proposition.[12]

### A. Pangilinan Summarized

In *Pangilinan,* Filipino nationals sought from the district court a declaration of citizenship under a 1942 statute that established a five-year period, ending December 31, 1946, in which aliens serving honorably in the United States Armed Forces during World War II could apply for naturalization. After the Philippines were liberated from Japanese occupation, in August of 1945, a vice consul in Manila was designated to naturalize such aliens. In October of that year, however, his authority was revoked in response to the Philippine government's concerns that the naturalization program would create a manpower drain. Approximately nine months later, in August of 1946, a new official was designated to perform naturalizations in the Philippines

---

**10.** *See* 8 U.S.C. §§ 1255a(f)(4)(A), 1105a(a) (review in courts of appeals); 8 U.S.C. §§ 1255a(f)(4)(A), 1105a(c) (exhaustion of remedies).

**11.** *See also Haitian Refugee Center v. Smith,* 676 F.2d 1023, 1033 (5th Cir.1982) ("Although a court of appeals may have sole jurisdiction to review alleged procedural irregularities in an individual deportation hearing *to the extent these irregularities may provide a basis for reversing an individual deportation order,* that is

not to say that a program, pattern or scheme by immigration officials to violate the constitutional rights of aliens is not a separate matter subject to examination by a district court and to the entry of at least declaratory and injunctive relief.") (emphasis in original).

**12.** The *Pangilinan* case was handed down by the Supreme Court on June 17, 1988, after the district court's invalidation of 8 C.F.R. § 245a.1(d), but before the reference to special masters.

and did so until the December 31, 1946, statutory cutoff date.

Nearly 40 years later, some Filipino veterans filed suit for naturalization under the terms of the long-expired statute. Fourteen of them had been present in the Philippines during the entire 1945–46 period but had taken no affirmative steps to be naturalized before the cutoff date. A fifteenth had made only preliminary efforts to obtain citizenship in the United States after his discharge from the service and before the 1946 cutoff; he did not complete the application in time for the deadline. A sixteenth had made an effort to apply at the American Embassy in the Philippines after his discharge from the service and before the 1946 cutoff; he was told no one at the Embassy could assist him. *Pangilinan,* 108 S.Ct. at 2214.

The Supreme Court dismissed the claims of all sixteen aliens, on the grounds that the federal courts lack power to confer citizenship in violation of a deadline imposed by Congress, regardless of equitable considerations. The 1946 deadline, the Court said, defined a congressionally-established policy decision that could not be overridden by the courts, either "by application of the doctrine of estoppel, [or] by invocation of equitable powers, [or] by any other means." *Id.* at 2216. The Court also rejected the aliens' argument that the temporary revocation of the vice consul's naturalization authority violated their constitutional due process and equal protection rights. *Id.* at 2216–17. Finally, the Court rejected one alien's assertion that he should be deemed to have constructively filed a timely application due to his pre-deadline efforts to file; the statute required applications to be filed while on active duty, and the alien in question had not begun to file until after discharge. *Id.* at 2217.

**B. Applicability of Pangilinan to the Present Case**

Petitioners contend that *Pangilinan* absolutely precludes the grant of any kind of relief to aliens who missed the May 4, 1988, deadline for legalization applications. Petitioners point out that, as in *Pangilinan,* Congress here established a deadline to be designated by the Attorney General and made timely application a prerequisite to the adjustment of legalization status. 8 U.S.C. § 1255a(a)(1)(A); *cf.* 108 S.Ct. at 2215.[13] They conclude from that similarity of congressional purpose that any conceivable form of relief that might be proposed by the special masters in *Ayuda* would violate *Pangilinan's* command that courts cannot "invo[ke] equitable remedies" to override a congressionally-established policy on the periods during which special-situation applications for citizenship must be made. 108 S.Ct. at 2215.

But does *Pangilinan* so clearly foreclose all relief in the present case that the district court must be deemed to have engaged in a "clear abuse of discretion or usurpation of judicial power," *In re Halkin,* 598 F.2d 176, 198 (D.C.Cir.1979), by establishing the special masters process to inquire into the plight of late filing aliens and to make recommendations for any relief legally possible? Our inquiry encompasses two questions. *First,* is there any scenario under which the district court could lawfully order the processing of applications filed after the May 4, 1988 deadline?[14] *Second,* are there any alternative remedies available, that do not involve a tolling or override of the deadline?

**1. Tolling of the Application Deadline**

The plaintiffs (and respondent Judge Sporkin) advance three bases for distinguishing *Pangilinan's* seemingly impenetrable bar against any extension of the May 4 deadline.

---

**13.** The distinction between legalization of resident alien status under IRCA and naturalization under the 1942 statute is not even suggested as a basis for distinguishing *Pangilinan.*

**14.** The district court has reserved decision on whether it will order the processing of applications filed after the deadline. *See* Supplemental Order VII (refusing to toll deadline); Supplemental Order XI, Respondent's Appendix D, at 8 (holding Supplemental Order VII in abeyance); *id.* at 2 (what forms of relief are precluded by *Pangilinan* is "an issue I do not have to determine at this time").

### a. Existence of Governmental Misconduct

Their first argument is that the *Ayuda* case involves governmental misconduct of a type not present in the *Pangilinan* case. As the district court has not yet passed on the plaintiffs' factual allegations, we do not decide whether *Pangilinan* could be distinguished if plaintiffs were to show that the INS failed to abide by the court's orders. Considering the state of the record at the present time, we do not rest our decision on this ground.

To begin, we pause to examine the plaintiffs' reading of *Pangilinan*. Plaintiffs argue that, in *Pangilinan*, the government did not violate the 1942 statute when it stripped the vice consul of his naturalization power. Plaintiffs' Brief at 7–9 & n. 16. This is incorrect. The Ninth Circuit's decision under review in *Pangilinan* held that the revocation of the vice consul's authority "violated what it characterized as the mandatory language" of the statute. 108 S.Ct. at 2215. Nothing in the Supreme Court's *Pangilinan* opinion even hints that the Court took a contrary view. The Court's reversal of the Ninth Circuit was squarely based on the premise that courts lack the power to grant equitable remedies tolling statutory deadlines for naturalization, not on the premise that there was no governmental wrong to be remedied.[15]

Counsel for Judge Sporkin argues a related distinction: that, unlike this case, the government engaged in no "affirmative misconduct" in *Pangilinan*. Respondent's Brief at 13–14. Counsel at oral argument gave as an example of "affirmative miscon-duct" the allegation that the INS continued to refuse "known to the Government" aliens under 8 C.F.R. § 245a.1(d) after the March 30 district court ruling, in violation of the court's orders. As petitioners point out, the district court did not find the INS' misinterpretation of IRCA to have been driven by a malicious motive, any more than the *Pangilinan* court found bad faith in the government's misinterpretation of the 1942 statute. *Compare* 108 S.Ct. at 2217 (lack of evidence that the government's acts "were motivated by any racial animus") *with* Plaintiffs' Appendix 6 at 15 (district court finding that INS "did not act in bad faith"). What remains to be determined is whether the government's actions *after* the March 30 district court ruling were qualitatively more culpable than those in *Pangilinan*. While the plaintiffs claim they will produce additional evidence of governmental misconduct in the relief proceedings,[16] we must reject government culpability as a ground for bypassing *Pangilinan's* holding at this juncture.

### b. Reasonable Opportunity to File

There are, however, two other arguments for distinguishing *Pangilinan*. The first is that *Pangilinan* does not rule out the possibility that the absence of a reasonable opportunity for "known to the Government" aliens to file applications under the IRCA might constitute a due process violation.

The Supreme Court rejected a due process claim made on behalf of the Filipino veterans in *Pangilinan*, but its discussion

---

**15.** Plaintiffs imply that the *Pangilinan* Court reversed the Ninth Circuit's determination that the revocation of the vice consul's naturalization power violated the statute. They point to the Court's explanation of its certiorari grant as having been based, "[i]n part," 108 S.Ct. at 2212, on a conflict with a Second Circuit case which held that there was no statutory violation. Plaintiffs' Brief at 8 n. 16. They also point out that the government's brief in *Pangilinan* advanced the Second Circuit's view. *Id.* at 8–9 n. 16. Our reading of the *Pangilinan* opinion, however, suggests that the Supreme Court either assumed the Ninth Circuit was right about the existence of a law violation or considered the matter irrelevant to its holding.

**16.** Plaintiffs presented evidence in April purporting to show that the petitioners failed to abide by the March 30 ruling of the district court. Yet as late as July 22, Judge Sporkin reiterated his finding that "the Government did not act in bad faith." Plaintiffs' Appendix 6 at 15. On the other hand, Judge Sporkin did indicate on September 27 that the need for reference to special masters was based in part on "the government's outright refusal to conduct an inquiry on its own in order to identify those persons who might have been injured by its impermissible interpretation of the statute." Supplemental Order XI, Respondent's Appendix D, at 3.

explicitly left open the viability of such a constitutionally-based claim in different factual circumstances, stating:

> Assuming that these [aliens] can properly invoke the United States Constitution, and granting that they are members of a special class that Congress intended to favor with statutory entitlements to naturalization, they were not deprived of those entitlements without due process. First, it did not violate due process for Congress to impose a reasonable limitations period upon the filing of naturalization petitions. Second, even assuming that a reasonable opportunity to file for naturalization was required, respondents were accorded at least that.

108 S.Ct. at 2216–17 (citation omitted). The court noted that a naturalization officer was available in the Philippines from August through October 1945 and from August 1946 to the end of that year, a total of seven months. Additionally, Filipinos could be and were naturalized in the United States and at various other locations around the world. *Id.* at 2217. The Court stated:

> We do not agree with [the aliens'] contention that in addition to these ample opportunities, [they] were entitled as a matter of due process to individualized notice of any statutory rights and to the continuous presence of a naturalization officer in the Philippines from October 1945 until July 1946.

*Id.* It is significant for our purposes that the *Pangilinan* Court's rejection of the due process argument hinged on the premise that none of the 16 plaintiffs could show that his only opportunity to file arose in the Philippines at a time when applications were not being accepted.[17]

In our case, it is not possible to say with any certainty that there were not aliens who were denied a reasonable opportunity to file between March 30 and May 4.[18] In contrast to *Pangilinan's* windows of opportunity—totaling some seven months and extending over a two-year period—in which naturalization was available in the Philippines (not to mention the availability of naturalization at other sites outside the Philippines), the "known to the Government" aliens in the present case had 39 days, following the district court's invalidation of the INS regulation, in which to initiate and complete their legalization applications. Moreover, one subset of the "known to the Government" aliens—those whose unlawful status stemmed from their willful violation of the mandatory reporting requirements of § 265 of the INA—had just *two days* to complete their applications. *See* Supplemental Order V, 687 F.Supp. at 668–69 (court's May 2 order covering § 265 aliens). It is entirely possible that many remained unaware of the district court's invalidation of the INS regulation upon which their prior ineligibility had been premised. It is also possible that, if the special masters uncover evidence that some "known to the Government" aliens continued to encounter misinformation or rejection in filing applications even after the district court's March 30 ruling, as plaintiffs' counsel has asserted, that could provide a basis for a due process claim.

We do not know if aliens exist who fit these circumstances, but it would certainly be premature for this court to insist that the district court drop all efforts to find

---

17. As for the two *Pangilinan* aliens who had taken some affirmative steps to file, the Court considered their situation (as contrasted with the others') only in its discussion of the "constructive filing" theory, which is discussed, *infra,* p. 1516.

18. At oral argument, petitioners claimed that the INS in November 1987 began taking "known to the Government" applications from aliens whose illegal status was known to any agency or department of the government. Petitioners' counsel stated that this development, which pre-

dated the March 30 ruling, was based on a similar ruling of the Northern District of Texas in *Farzad v. Chandler,* 670 F.Supp. 690 (N.D.Tex. 1987). Plaintiffs, on the other hand, allege that the INS did not change its policy nationwide in response to the *Farzad* ruling. This is one factual issue that no doubt will be explored by the district court and/or the special masters. The existence of a factual dispute on this score, if anything, emphasizes the inappropriateness of mandamus relief.

out.[19] Reiterating always that this is a petition for mandamus and that accordingly petitioners' showing of the inescapability of *Pangilinan's* vise must be "clear and indisputable," we find plausible plaintiffs' argument that a basis for a constitutional claim may exist consistent with *Pangilinan* for aliens denied a reasonable opportunity to file their naturalization applications.

### c. Constructive Filing

We also conclude that *Pangilinan* does not entirely foreclose the concept of constructive filing within the deadline by aliens who sought to comply but were turned away through no fault of their own.

One plaintiff in *Pangilinan* argued that he should be deemed to have filed a timely application because he took some affirmative steps to file prior to the cutoff date. This argument was based on *Matter of Naturalization of 68 Filipino War Veterans*, 406 F.Supp. 931 (N.D.Cal.1975), in which the district court divided claimants into three categories and held that alien servicemen who had taken affirmative steps to apply before the deadline (whom the court dubbed "Category I" aliens) should be deemed to have "constructively filed." *Id.* at 939–40, 951. The *Pangilinan* Court, citing *68 Filipino War Veterans,* rejected this one plaintiff's "Category I" assertion not for legal unacceptability but because his facts did not warrant such treatment. The Court observed that the plaintiff had not taken the preliminary steps both (a) before the deadline and (b) while on active military duty, as the statute required. 108 S.Ct. at 2217; *see INS v. Hibi,* 414 U.S. 5, 7, 94 S.Ct. 19, 20, 38 L.Ed.2d 7 (1973).

By contrast, it is entirely possible that some members of the putative class in this case could show that they took affirmative steps to file before May 4, 1988, thus warranting a finding of constructive filing. If, for example, a "known to the Government" alien went to an INS office and was turned away on the basis of 8 C.F.R. § 245a.1(d), the alien's action might have been "the only affirmative step a prospective petitioner could take under the Service regulations" in force at the time. *68 Filipino War Veterans,* 406 F.Supp. at 940. Consequently, that action might be considered "the constructive equivalent of filing a petition" for amnesty. *Id.* Although the *Pangilinan* Court did not explicitly approve the constructive filing analysis of *68 Filipino War Veterans,* its rejection of such a claim on factual, rather than conceptual, grounds leaves open at least the possibility that it could be successfully argued in appropriate circumstances.

At oral argument, petitioners contended that "constructive filing" is just another name for the estoppel and equitable remedies rejected by the *Pangilinan* Court. The concepts are, however, distinct. *Pangilinan* rejected the use of equitable remedies to assist aliens who acknowledgedly did not attempt to comply with the statute.[20] The constructive filing argument, by contrast, entails a showing that the aliens in question complied with the statute by attempting to file applications in a proper and timely fashion. *See 68 Filipino War Veterans,* 406 F.Supp. at 939–40. Once again, we find that *Pangilinan* did not so securely shut the door on such a claim as to warrant mandamus.

### 2. *Alternative Forms of Relief*

Finally, even if we assume that the district court cannot toll the statutory deadline for any of these "known to the Govern-

---

**19.** We note that a due process challenge would not necessarily require the filing of a new lawsuit. Plaintiffs' original complaint alleges a fifth amendment violation and prays for, *inter alia,* an opportunity to file legalization applications under the IRCA after the May 4, 1988, deadline. Complaint, Respondent's Appendix A, at 23, 25.

**20.** Of the 16 aliens in *Pangilinan,* 14 took no affirmative steps to file before the deadline.

108 S.Ct. at 2214. Two others engaged in preliminary efforts to file before the deadline, but after they had ceased to be on active duty. *Id.* Their failure to file while on active duty was fatal under the statute. *See id.* at 2217; *INS v. Hibi,* 414 U.S. 5, 7, 94 S.Ct. 19, 20, 38 L.Ed.2d 7 (1973) (naturalization under § 702 "could take place only during active service in the Armed Forces"); Nationality Act of 1940, ch. 199, 56 Stat. 182, § 702.

ment" aliens, other forms of lesser relief may be available. That is precisely what the special masters have been asked to look into—what kinds of relief may be granted dependent on the facts and status of the adversely affected aliens. The district court has suggested temporary stays of deportation or temporary work authorizations. Plaintiffs' Appendix 1 at 17–18; Plaintiffs' Appendix 6 at 14–18. We need not decide if such grants by the district court would be authorized or appropriate in any circumstances; indeed, armed with facts on individual cases, the court might merely recommend to INS such ameliorative measures. Or it could decide to request or instruct those same authorities to permit aliens to raise their constructive filing arguments in the course of individual deportation proceedings. The only form of relief specifically disapproved by the *Pangilinan* Court was the lower courts' asserted "power to make someone a citizen of the United States." 108 S.Ct. at 2216.[21] We cannot on that basis say that the district court in this case will not be able to formulate any complete or partial relief for the "known to the Government" aliens without violating the command of *Pangilinan*. The possibility of relief that does not toll the statutory deadline provides yet another reason to abstain from issuing a writ of mandamus.

## C. Irreparable Harm Requirement

▪ Our discussion of *Pangilinan* demonstrates that petitioners have failed to make a "clear and indisputable" showing that the district court lacks jurisdiction. Although we believe that discussion provides sufficient reason to forbear from issuing mandamus, we note that petitioners also fail to show that appeal is a clearly

inadequate remedy and that they would be irreparably harmed by being forced to await the disposition of an appeal. The only harms allegedly caused by the reference to special masters are the expenses and other litigation burdens involved in the "time-consuming" special masters' inquiry. Petition at 20. Yet it is clearly settled that mandamus cannot be used to shortcut the appeal process, "even though hardship may result from delay and unnecessary trial." *Bankers Life & Casualty Co. v. Holland*, 346 U.S. 379, 383, 74 S.Ct. 145, 148, 98 L.Ed. 106 (1953). The impropriety of granting mandamus simply to relieve a litigant of ordinary litigation burdens reinforces our determination that petitioners have not shown that they warrant the writ.[22]

## CONCLUSION

Despite the thoughtful arguments petitioners have proffered to support the view that the district court's reference to special masters of the task of exploring relief for aliens adversely affected by the government's erroneous interpretation of its eligibility requirements constitutes a clear abuse of discretion and a usurpation of judicial power, we find it does not. *Ayuda* in its present posture does not clearly fail to present a case or controversy, and the district court's continued exercise of jurisdiction does not violate the judicial review provisions of the IRCA. We reject petitioners' contention that *Pangilinan* absolutely precludes any and all possible relief that the district court might fashion after receiving the special masters' report. If and when the court orders relief, petitioners will have every opportunity to reassert arguments about its unauthorized or inappropriate nature through the traditional chan-

---

**21.** The *Pangilinan* Court understandably focused only on the constitutional and statutory limitations on the power of courts to confer citizenship. *See* 108 S.Ct. at 2215, citing U.S. Const., art. I, § 8, cl. 4 ("The Congress shall have Power ... [t]o establish an uniform Rule of Naturalization...."); *id.* at 2216, citing 8 U.S.C. § 1421(d) (a "person may be naturalized ... in the manner and under the conditions prescribed in this subchapter, and not otherwise"); *id.* (referring to "the power to confer citizenship"); *id.* ("Once it has been deter-

mined that a person does not qualify for citizenship, ... the district court has no discretion to ... grant citizenship.").

**22.** Indeed, as it turns out, two individuals have accepted special master appointments with the understanding that they will serve without pay if it is determined that the district court cannot lawfully assess the special master costs against the Government. *See* Plaintiffs' Appendix 3.

nel of appeal. We do not find the "clear and indisputable" lack of jurisdiction in the district court to explore further relief for late-filing aliens, that is necessary to warrant a writ of mandamus. In our view, there is still room for reasonable argument on the scope and limits of the *Pangilinan* decision. In sum, we decline to issue the writ.

SO ORDERED.